(No. 68012.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LAWRENCE JACKSON, Appellant.

*Opinion filed September 26, 1991.—Rehearing denied December 2, 1991.*

50

52

BILANDIC and FREEMAN, JJ., took no part.

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb, Assistant State's Attorney, and Linda Woloshin, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

On September 25, 1986, an indictment was filed in the circuit court of Cook County charging defendant, Lawrence Jackson, with multiple counts of murder, attempted murder, armed violence, home invasion, armed robbery, aggravated battery, aggravated battery of a child, aggravated unlawful restraint, and residential bur-

glary, in violation of various sections of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1(a), 10—3.1, 12—4(a), (b)(1), 12—4.3(a), 12—11(a)(2), 18—2, 19—3, 33A—2). The State later chose not to proceed on some counts. On June 23, 1988, the State obtained guilty verdicts on all charges submitted for the jury's consideration: four counts of murder, one count of attempted murder, one count of aggravated battery of a child, five counts of home invasion, five counts of armed robbery, and one count of residential burglary. The State requested a death penalty hearing. A sentencing hearing was commenced on June 24, 1988. The jury concluded defendant was eligible for the death penalty, finding that defendant was 18 years of age or older at the time of the murders (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and that statutory aggravating factors were present (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b)(3), (b)(6), (b)(7)). The jury then heard and considered mitigating and aggravating evidence, ultimately concluding that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court, on September 7, 1988, sentenced defendant to death, 60 years' imprisonment on the attempted murder, 30 years' imprisonment for armed robbery and home invasion, and 15 years' imprisonment for residential burglary. Defendant's death sentence has been stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

The 18 issues raised in defendant's brief are summarized as follows: (1) whether the prosecution's expert witness incorrectly stated the law, and whether the witness and the prosecutor misled the jury so as to require reversal; (2) whether the prosecution violated discovery rules by withholding statements by defendant, his codefendant, and an expert witness until such time as the statements were to be used against the defense, thereby

creating reversible error; (3) whether the prosecution (a) gave adequate, race-neutral explanations for excusing black jurors with peremptory challenges, (b) prejudiced the jury at both the guilt-innocence and sentencing phases of trial with irrelevant victim-impact testimony, and (c) prejudiced the jury at sentencing by arguing that defendant had gotten "breaks" on prior convictions and that the law required imposition of the death penalty; (4) whether the trial court committed reversible error (a) by refusing to question prospective jurors as to whether they would automatically vote for the death penalty, (b) by stating in the jury's presence that the jury would not *impose* the death penalty, (c) by allowing unreliable aggravating evidence at sentencing, and (d) by inadequately instructing the jury at the sentencing phase of trial; (5) whether reversal is required (a) where the jury found defendant eligible for the death penalty based upon an instruction which incorrectly included residential burglary, with armed robbery and home invasion, as a predicate felony for purposes of eligibility, and (b) where the prosecutor later incorrectly stated that capital punishment is appropriate for "murders that occur during the course of forcible felonies like home invasion, armed robbery, and residential burglary"; (6) whether the natural life sentence imposed upon a codefendant warrants reduction of defendant's sentence to life in prison; and (7) whether the Illinois death penalty statute is unconstitutional.

Pursuant to defendant's request, the circuit court, on September 15, 1987, entered an order directing Dr. Robert Reifman to examine defendant and file a report "as to his mental condition." Reifman's report, dated October 5, 1987, indicated defendant was fit to stand trial, and that defendant "was legally sane at the time of the alleged act." On January 13, 1988, defendant filed a motion to suppress statements he had made to law en-

forcement officials. Defendant's motion was denied on January 20, 1988. Also on that day, his codefendant requested a severance since he would be asserting defenses of drug intoxication and compulsion which implicated defendant. The court granted the severance. On January 26, 1988, codefendant made a motion for separate jury trials which defendant adopted. The court "denied" the motion, ruling that there would be separate, simultaneous trials with separate juries. In light of the court's ruling, defendant, on February 18, 1988, moved to strike codefendant's affirmative defense of compulsion. The court denied the motion. Additional pretrial motions were heard and denied on February 22, 1988. These motions included: a defense motion to preclude the State from "death qualifying" or "Witherspooning" prospective jurors; an alternative request which sought submission of questions to jurors, asking them if they would automatically vote for imposition of the death penalty if defendant were found guilty of murder; and a motion to declare Illinois' death penalty statute unconstitutional. Prior to jury selection, the court reconsidered its rulings on defendants' motions and granted a full severance.

Jury selection for defendant's case commenced June 16, 1988. The State exercised eight peremptory challenges, three of which were directed toward blacks. In each instance, the prosecutor offered reasons for her action, and the circuit court found those reasons to be racially neutral. The jury chosen consisted of six white males, two white females, one black male, two black females, and one Hispanic female. The trial proper began June 20, 1988.

The victims, Vernita Winder, her three daughters, Mark "Tiny" Brown, Vernita's boyfriend, and Shirley Martin lived in apartment 210 at 1850 West Washington. Vernita's daughters were six-year-old Urica (who was

eight years old when she testified at trial), five-year-old Dana, and 18-month-old Shanita (Nicki). Urica testified that late in the evening, on September 24, 1986, she was watching television. There was a knock on the door and Urica asked who it was. A voice answered, "Bobbie." Urica saw Bobbie and a man with him whom she had seen at a party at "Bobbie's kid's" house. That man was the defendant. Bobbie Driskel asked if "Tiny" was there and Urica said he was sleeping, but she would wake him up. Driskel asked for and received permission to use the bathroom. Defendant stood by the entrance to the apartment. When Driskel emerged from the bathroom, he went over to where "Tiny" (Mark Brown) was sleeping on the couch with an infant, Shanita (Nicki). Urica went to her bedroom, where her sister, Dana, was sleeping. Their mother, Vernita, came into the room, woke Dana, and took them into her room. Shirley Martin was already in the room. They tried to keep defendant and Bobbie Driskel out of the room by leaning against the door; however, defendant forced the door open. Shirley faced the defendant, who was holding a 12-inch long knife, and said, "I love you." Defendant answered, "I don't love you." Defendant stabbed Shirley in the heart. Shirley slid down the wall, leaving the wall covered with blood. Defendant then left the room. Bobbie Driskel walked toward Urica and told her he was not going to "mess" with her. Driskel, who had a knife in his hand, then stabbed Urica in the stomach. Urica ran to the front room door, trying to get out.

Denise Adams, in apartment 310 directly above the victims' apartment, heard what sounded like running through the apartment, a door slam and a little girl crying, "Let go of my mother before you kill her."

Bobbie Driskel dragged Urica by her foot back into the room and began stabbing her again. The six-year-old

held her breath, closed her eyes, rolled them up, playing dead, and Driskel then stopped stabbing her.

Driskel went to a dresser and said, "Damn, ain't no money." Urica continued to play dead until defendant and Driskel left. She got up and saw Shirley on the floor covered with blood. Shirley was not moving. Urica went to the front room where she saw Dana, "Tiny" and her mother. Dana had blood all over her body and she was not moving. "Tiny" was on the couch. He had blood on his feet; half of his foot was chopped off and it was leaning back. Urica's mother was behind the kitchen table. She had blood all over her body and was not moving. Urica got a drink of water and went to sleep.

Urica woke the next morning when she heard her cousin, Tony, and her mother's friend, Cherrie, calling from outside the window. Later that morning, Urica's 12-year-old cousin, Tamico, telephoned and asked to speak to Urica's mother. Urica kept calling out Tamico's name and Tamico told her, "Stop playing. Put Vernita on the phone." Urica told her that she could not wake her mother up. Tamico, who lived on the fourth floor of the same building, came down to the apartment and Urica answered the door. Tamico saw that Urica had several stab marks on her stomach and arms. She was covered with blood and was still bleeding from some of her wounds.

Tamico walked into the apartment and saw the motionless bodies covered with blood. Tamico told her that she was going upstairs to get help.

Tamico woke her mother, Alice Winder, and told her to go to Vernita's because there was blood all over the place. Alice Winder found Urica covered with blood with her stomach hanging out. She found "Tiny" on the couch, and he appeared dead. Dana and Vernita were also dead. Vernita was lying in the kitchen. Alice Winder asked Urica, "Who did this?" Urica replied, "Tiny's

cousin." Alice Winder knew "Tiny's" cousin, Bobbie. Alice left the apartment with Shanita (Nicki), Vernita's infant daughter, who was evidently unharmed. Alice went to a neighbor's house and asked that they call the police.

Urica was taken to the hospital where police spoke to her. She talked to an officer about what happened that night and picked photographs of defendant and Bobbie Driskel from a group of photographs the police showed her.

Dr. Demetra Soter treated Urica Winder at the trauma unit of Cook County Hospital. Urica had multiple stab wounds of her arms, hands, neck, chest and abdomen. When her condition was stabilized, Urica was taken to an operating room. During an eight-hour surgery, her blood pressure dropped approximately five times, requiring the administration of massive amounts of blood and fluid. A total of 18 drains and intravenous tubes were placed into her body. Attending physicians "did not think there was a very good chance that she would survive the next few days." Urica was given very little pain medication because such medication tends to significantly lower blood pressure.

Urica continued to see Dr. Soter every two months for medical care; she was seen weekly for psychiatric treatment. Urica bears the scars from 48 stab wounds. She also has external and internal scarring from surgery.

Mark Brown's mother, Dorothy Brown, testified that she received word at work that her son had been killed. She and her husband went to Mark and Vernita's apartment building, where they encountered police cars, an ambulance and a crowd of people. She was escorted to the hallway outside her son's apartment, where she spoke to a police officer and, thereafter, lost consciousness. When she regained consciousness, the police asked her where Bobbie Driskel lived, and she told them. Bob-

bie Driskel is her nephew. Later, Brown went to the medical examiner's office, where she viewed her son and again fainted. Brown said her son and Driskel had been in contact during the months prior to September 1986. Mark Brown had told "just about everybody [he] knew" that he was saving money for a car. Alice Winder identified Vernita Winder and her four-year-old daughter, Dana, at the Cook County morgue. In the course of Winder's testimony, she mentioned that she had three sisters, excluding Vernita. Annie Trotter, Shirley Martin's aunt, testified that she identified Shirley's body at the Cook County medical examiner's office. Trotter testified, over objection, that Shirley had been going to school and was about to receive her GED, and that Shirley had a five-year-old son, Michael.

Dr. Robert Stein, chief medical examiner of Cook County, performed autopsies on the bodies of Vernita Winder, Dana Winder, Mark Brown and Shirley Martin. Vernita Winder's body bore 55 incise wounds, including wounds to the back, breast, abdomen, upper chest, neck, temple, arms, legs, hands and wrists. Eleven were stab wounds; 14 were defense wounds to the hands, wrists or arms. Stein concluded Vernita Winder's death was caused by multiple stab wounds of the neck and chest involving the carotid artery and the lung.

Four-year-old Dana Winder sustained 19 incise wounds, five of which were stab wounds and seven of which were defense wounds. Dana's most serious wounds were those of the chest and abdomen. The stab wound to the abdomen caused a protrusion of the intestines through the wound. The child died of multiple stab wounds affecting the heart, lung and aorta.

Dr. Stein's examination of Mark Brown revealed 29 incise wounds, 26 of which were stab wounds. Stein found a cluster of 10 incise wounds to the neck, as well as wounds to the chest, shoulder, arms, forearm, hand

and a gaping wound of the right foot. Brown's Achilles tendon and surrounding lesser tendons were severed. The cause of Mark Brown's death was multiple stab wounds affecting the aorta, heart and lungs.

Shirley Martin sustained a total of 15 incise wounds of which seven were stab wounds and six were defense wounds. The cause of death was multiple stab wounds of the chest, affecting the aorta and lung; however, incise wounds were noted over a more extensive area of her body, including wounds to the back, leg and breast, as well as a gaping hole in the back of her ear.

Defendant and Bobbie Driskel were questioned by law enforcement officials on September 25, 1986, the day after the murders. Defendant had turned himself in to authorities. Detective Steve Peterson met with defendant, identified himself and the other detectives present, and told defendant why they had been looking for him. They accompanied defendant to an interview room where he was advised of his *Miranda* rights. Defendant acknowledged that he understood his rights and agreed to speak to the detectives. Peterson informed defendant that his name had come up in the investigation of a quadruple homicide. Defendant said he knew nothing about it, adding that he had been home all night the previous evening.

Assistant State's Attorney Michael O'Donnell spoke with defendant at approximately 9:15 p.m. on September 25, after O'Donnell had first identified himself and advised defendant of his rights. O'Donnell asked defendant if he needed medical attention for cuts on his hand and arm. Defendant said he did not. O'Donnell then asked defendant what he had been doing the previous evening. Defendant replied he had been in his house all evening, smoking cocaine. O'Donnell expressed disbelief and asked defendant to explain how he had gotten the large cuts on his hand and arm. Defendant said he had been

smoking cocaine when his pipe exploded in his hands. Again, O'Donnell questioned defendant's story and cautioned him to "think about" what he was saying. At that point, defendant acknowledged his participation in the crimes and gave O'Donnell an oral statement, followed by a written statement.

According to defendant, he and Bobbie Driskel were smoking cocaine in defendant's apartment on September 24, 1986. When they ran out of cocaine and money, and were unsuccessful in their attempts to obtain money to buy more cocaine, they decided to kill Driskel's cousin, Mark Brown, and take his money, television and video recorder. They enlisted defendant's uncle, O.C. Roland, to drive them to Brown's apartment in the Henry Horner Projects, 1850 West Washington, in Chicago. Bobbie Driskel told Roland there was someone there holding merchandise for him. Defendant said he and Driskel planned their course of action on the drive to the apartment, speaking in whispers so Roland could not overhear them. They were armed with knives.

When they arrived at the projects, Roland parked in the back by a stairwell. Defendant and Driskel went upstairs to the second floor, to the first apartment "off the corner on the left." Defendant handed Driskel a knife, then Driskel knocked on the door.

A woman answered the door and Driskel asked if "Tiny" was there. She said he was sleeping, but she would wake him up. Driskel asked for and received permission to use the bathroom. Defendant stood by the entrance to the apartment. When Driskel emerged from the bathroom, he went over to where Mark Brown was sleeping on the couch with an infant. According to defendant's court-reported statement, Driskel got a cigarette out of his pocket and said, "Man, what are you going to do? What are you going to do?" Driskel then pulled out his knife and plunged it into Brown's chest.

Assistant State's Attorney O'Donnell testified that defendant said *he* asked *Driskel,* "What are you going to do?" After Brown was stabbed he jumped up, at which point defendant grabbed Brown and began stabbing him to death.

By that time, the other people in the apartment had gone into a back bedroom and were trying to keep the door to that room closed by leaning on it. Defendant forced the door open and, as he did, one woman ran out, while another remained inside. Defendant stabbed the woman in the room, and later assisted Driskel in stabbing the woman who left the room, telling Driskel, "Kill her too."

There were three children in the apartment. The baby had been on the couch with Mark Brown; the other two children were in the bedroom. One of the children in the bedroom ran out crying, "momma, momma," after defendant had finished killing her mother. Defendant said Driskel grabbed that child and put his hand over her mouth. According to defendant, "I turned around. When I turned back around the kid was laying on the floor dead." Defendant did not comment on the fate of the other child in the bedroom. When defendant and Driskel left the apartment, there was blood everywhere and no one was moving.

They took a television and video recorder. When they got downstairs, they had some difficulty getting the television into the car, so Roland got out and assisted them. Defendant said they took the television and video recorder to a residence at Washington and Laramie. Roland and Driskel carried the television and recorder upstairs to a second-floor apartment. Defendant stayed in the car, as he was bleeding from wounds he had sustained earlier. He explained, "When I was stabbing [the victims] I accidentally stabbed myself." Driskel and Roland returned to the car, having sold the television and

video recorder to "some stud" for $70 and a check. What happened thereafter is not entirely clear. In his oral statement, defendant said "they" went to buy some more cocaine, then returned to defendant's apartment. In his written statement, defendant claimed he went to the "Cane spot." He threw away his knife, but could not recall where.

When defendant's statements were taken, he did not appear to be under the influence of drugs or alcohol and, in fact, said he was not. Defendant was alert, responsive to questions asked, and had no difficulty recalling or relating what had happened.

Partial corroboration of the trio's whereabouts after the murders was provided by Phillip Simms, Mark Brown's employer and Driskel's former employer. At approximately 1 a.m. on September 25, 1986, Simms was awakened by a knock on the rear door of his apartment. Bobbie Driskel identified himself and Simms opened the door. Driskel asked Simms if he was interested in purchasing a video recorder and television which Driskel said belonged to O.C., his uncle; Simms said he was interested in seeing the items. Driskel went down the rear steps of the apartment to an automobile parked in the alley. Simms could see two other people by the vehicle, but could not identify them.

Less than five minutes passed before Driskel returned with the television, video recorder and an individual Driskel introduced as his uncle, O.C. Eventually, Driskel and Simms agreed upon a price of $120. After Simms checked both items and had satisfied himself that they were in working order, he gave Driskel $70 in cash and wrote Driskel a check for the balance. Driskel gave Simms a receipt, after which Driskel and the other man left.

After work, Simms listened to the evening news and learned what had happened to Brown. He called the Chi-

cago police department and offered to turn in the merchandise Driskel had sold to him, which he did when the police arrived. He accompanied the police to the police station at Harrison and Kedzie in a squad car with O.C. Roland.

Oliver C. Roland—defendant's uncle and the uncle of Bobbie Driskel's wife—testified that on the evening of September 24, 1986, he had purchased approximately $130 worth of cocaine and, between 5 and 6 p.m., he and Bobbie Driskel had smoked between $80 and $110 worth of it. Defendant came to Roland's residence around 6 or 7 p.m. At approximately 7 or 8 p.m., defendant began smoking cocaine with Roland and Driskel, and also smoked PCP-laced marijuana with them. Defendant later had some rum. Roland did not recall seeing defendant use heroin.

During the course of the evening, Roland drove Driskel and defendant to the Henry Horner Projects twice. On neither occasion did defendant and Driskel whisper to each other or talk of killing anyone or stealing anything. On the second trip, sometime after 10 p.m., they stopped twice along the way so that Driskel could find someone to buy "his" television and video recorder. Driskel had told Roland that they were going to the projects to pick up Driskel's television and video recorder so they could sell the items and buy more cocaine.

When they arrived at the projects the second time, Roland parked in back and waited outside while defendant and Driskel went into the apartment complex. When they returned, defendant was carrying a television "in one hand"; his other arm was bleeding. Roland asked defendant what had happened to his arm. Defendant said he had cut it on some glass. Later, Roland asked defendant if he had burgled someone's home. Defendant snickered. Roland got out to help defendant and Driskel put the television into the trunk, then got back in the

car and drove to Phillip Simms' apartment, where he and Driskel sold the television and video recorder to Simms for cash and a check. Defendant remained in the car because of his injury. They used the cash to buy more cocaine and, after doing so, returned to Roland's home, where they smoked it.

Roland, who was approximately six feet tall and weighed about 170 pounds, testified that he had consumed $60 or $70 worth of cocaine, "hitting one joint" laced with PCP a couple of times, before his second trip to the Henry Horner Projects. He said he felt normal and had no difficulty driving.

During the course of the evening, Roland had no difficulty understanding what defendant was saying. He observed that defendant was not stumbling or falling down. In fact, defendant, who stood roughly six feet three or four inches tall and weighed about 290 pounds, adeptly carried a large television "in one hand." Even later, after they had obtained and consumed more cocaine, defendant appeared to have no difficulty speaking, walking or maneuvering. Defendant never told Roland he could not remember where he had been or what he had done.

Roland, who consumed drugs with defendant and Driskel that evening, testified he had no difficulty remembering what happened the evening of September 24, with the exception of "minor details." Roland said he believed cocaine made him more alert. Roland said he spoke with defendant on the telephone sometime after defendant had been arrested. Over a defense objection grounded on nondisclosure, Roland testified that defendant related what had happened in the apartment and acknowledged he had stabbed the occupants.

Defendant called Dr. Marvin Ziporyn to testify, ostensibly, in support of defendant's drug intoxication defense. In February of 1988, Ziporyn interviewed defendant for

approximately one hour at the Cook County jail. Dr. Ziporyn also reviewed police reports, a transcript of O.C. Roland's testimony, photographs, the report of Dr. Robert Reifman, a copy of the charges against defendant and defendant's statements.

Initially, Ziporyn did a routine physical examination of defendant, noting defendant's body language in the process. Defendant spoke lucidly and coherently. He was responsive and cooperative. His answers were direct. Ziporyn observed no physical abnormalities.

Next, Ziporyn conducted a formal mental status examination in order to ascertain defendant's orientation as to time, place and person, and to test his memory, ability to calculate, and ability to use "the ordinary logic of everyday life." Thereafter, Ziporyn tried to ascertain defendant's "general concept of his existence in life." Ziporyn concluded defendant exhibited "no marked or major mental issues."

In the interview segment of the examination, defendant acknowledged that he had been involved in "a situation where four homicides occurred." However, defendant said he had been under the influence of drugs at the time and his recollection of events was "very hazy." He claimed he could supply only random details. Defendant told Ziporyn he did not know why the murders had taken place; however, he did have a "firm recollection" that he had not struck the first blow.

Defendant claimed to have taken phencyclidine (PCP) on the night of the murders. Ziporyn described PCP as a powerful chemical that affects, primarily, that portion of the brain which is responsible for reason, judgment and impulse control. Ziporyn said PCP causes confusion, agitation, poor impulse control and defective judgment. Social behavior becomes "maladapted." A person using PCP becomes belligerent, truculent, fierce and unpredictable, according to Ziporyn.

Defendant also claimed to have taken cocaine and heroin. Ziporyn said cocaine acts as an exciting agent, tends to cause feelings of paranoia, and accentuates the effect of PCP. Per Ziporyn, heroin acts to prolong the impact of the cocaine. Ziporyn believed PCP would be the predominant agent, causing poor impulse control, poor judgment, belligerence and unpredictability. Defendant did not tell Ziporyn how much of each drug he had ingested, but he did not appear to Ziporyn to be malingering.

Ziporyn concluded defendant had appreciated the criminality of his behavior, but he had been unable to conform his behavior to the requirements of the law. Asked how one could appreciate the criminality of his behavior, yet not be able to conform to the law's requirements, Ziporyn stated:

> "Well, in the first place irrational behavior the individual involved does have the ability to formulate plans for it, it is just that the plans are irrational. So, it is not that you can't plan anything or reason anything. You're dealing with reason but you're dealing with irrational reason.
>
> Secondly, you can be aware that something is taboo, let's put it that way, and yet not be able to help yourself. For example, supposing that I am in a public conveyance and I see a sign on the door, it says, sneezing forbidden, violator will be prosecuted. Now, my mind is telling me that I must not sneeze and yet I may not be able to prevent myself from sneezing because we're dealing with different aspects of the brain and what can and cannot be controlled."

Under cross-examination, Dr. Ziporyn conceded that two psychiatrists can examine the same subject and come to different conclusions. Variables inherent in examiners and examinations may result in divergent opinions. The personality of the examiner and his or her bias or philosophy may account for differing diagnoses. Ziporyn acknowledged that he is a strict determinist who

believes "all men are victims of their destiny and \*\*\* cannot escape their environment." He has authored a book, entitled Born to Raise Hell, in which he espouses his views. Ziporyn does not believe in punishment for criminal acts. He conceded that he brought his philosophy with him when he evaluated defendant.

Furthermore, Ziporyn admitted defendant had not related the amounts of drugs he had taken, the purity of the drugs, the period over which they were taken, or the method of ingestion. Ziporyn took defendant at his word when he said he took the drugs.

Ziporyn noted that defendant *had* given a very detailed account of his participation in the crime, but Ziporyn opined that PCP, cocaine and heroin have nothing to do with memory defects. Ziporyn was aware defendant had told Dr. Reifman that he was home with his mother when the murders were committed. According to Ziporyn, defendant was clearly attempting to put himself in the best possible light. Ziporyn had also considered the opinion of psychologist Karen Smith that defendant "displayed an understanding and an awareness of the situation but seem[ed] to hold the unrealistic belief that he [could] escape punishment by forgetting what happened." Despite defendant's failure to apprise Ziporyn of the quantity of drugs involved, Ziporyn nevertheless maintained that defendant could not have conformed his conduct to the requirements of the law.

The assistant State's Attorney, Paula Daleo, then asked, "Doctor, isn't it true that you told Mr. Brady [former assistant State's Attorney] that you had told Ms. Stewart [assistant public defender] that you didn't think much of this defense in this case?" At that point, an objection was interposed and a sidebar was requested and granted. The defense maintained that if there were notes or summaries of the conversation at issue, the State should have previously tendered them, and had not

done so. Defense counsel noted that the entire drug intoxication defense was based on Dr. Ziporyn's testimony. Daleo admitted she was in possession of Brady's notes, summarizing the Ziporyn-Brady conversation. She offered no excuse for failing to tender Brady's notes, other than her understanding that Brady had informed the defense attorneys of the conversation. Defense attorneys, Marc Miller and Neil Spector, denied being privy to the contents of Brady's conversation with Ziporyn. Stewart did not participate in the sidebar conference. The court ordered Daleo to turn over Brady's notes to the defense. Defense attorney Miller moved for a mistrial. That motion was denied. Thereafter, Daleo offered to withdraw her question. The court stated it intended to admonish the jury to disregard the question in the event the question was withdrawn. The court asked Daleo if she intended to withdraw the question, and the following colloquy ensued:

"MS. DALEO: Judge, I can prove up this.

THE COURT: Well, I don't care if you can prove it. Please answer the question I'm addressing. Do you intend to withdraw or not, yes or no?

MS. DALEO: Judge, I'll withdraw the question.

MR. SPECTOR: Judge, our motion for mistrial lies even if she withdraws it the jury has heard it and nothing that the Court can instruct them can take away the extremely prejudicial effect of having heard the question put to the doctor and the inference.

THE COURT: All right, the State has made the representation that they are withdrawing it. I will instruct the jury to disregard the question.

Motion for mistrial will be denied.

That is your intention, is that correct Ms. State's Attorney?

MS. DALEO: Yes, Judge."

The question was thereafter withdrawn in the presence of the jury and the jury was instructed to disregard the

question. After further inquiry on a variety of subjects by the State and the defense, Dr. Ziporyn's testimony was concluded and he was excused.

James O'Donnell, doctor of pharmacology, testified to the effects of cocaine, heroin and PCP on humans and his familiarity with those effects. Cocaine's primary effect is that of a central nervous system stimulant. Persons intoxicated on cocaine are "described" to behave abnormally, and to have impaired judgment. Cocaine has been "associated with" violent and aggressive behavior.

Heroin is a central nervous system depressant. Mental and physical activity decreases while one is under the influence of heroin.

PCP's effect on the brain is that of a tranquilizer. Reported physical reactions to the drug include violent behavior, severe dream reactions, amnesia and hallucinations.

Dr. O'Donnell interviewed defendant in February of 1988 at Cook County jail. Prior to the interview, O'Donnell reviewed police reports, pathology reports, statements of defendant and O.C. Roland, investigators' reports and medical records. According to defendant, he began using cocaine and heroin at 7 p.m. on the night of the murders and used them continuously throughout the evening, purchasing additional amounts at 10 and 11 p.m. He said he used PCP "the following day along with marijuana and heroin." Defendant told O'Donnell he started using marijuana when he was nine. In his early teens, he began using codeine and tranquilizers. At 17, defendant was arrested for an armed robbery which, according to defendant, was committed to get money to buy drugs. Defendant was jailed and, during his incarceration, experienced heroin for the first time. Defendant said he started using cocaine and PCP in 1985. Defendant described his experience with drugs as "long continuous chronic high use."

Under cross-examination, O'Donnell acknowledged that a person under the influence of cocaine, heroin or PCP can perform normal functions. Although the ability to act knowingly and intentionally *may* be affected by those drugs, a person using them may nonetheless be capable of acting "knowingly, volitionally and intentionally." O'Donnell conceded that he did not know how much cocaine or heroin defendant had ingested on the evening in question, nor was he aware of the purity of the drugs involved. O'Donnell acknowledged he did not know for certain what impact the drugs had on defendant, other than what defendant told him. If defendant lied, O'Donnell's opinion might be affected. Although defendant claimed he was unable to remember what happened inside the apartment at 1850 West Washington, defendant gave O'Donnell a fairly detailed account of his drug usage on the evening of the murders.

Near the conclusion of his cross-examination, the prosecutor asked O'Donnell if he was aware that an "outside stimulus" could have a sobering effect on an individual under the influence of drugs. O'Donnell replied, "I have had that circumstance described to me by one person." When he was asked who that person was, O'Donnell responded, "Mr. Driskel." At that point, an objection was interposed, and the court ruled, "Objection is not relevant, it will be stricken." Defense counsel did not ask for clarification of the court's ruling. O'Donnell was then asked whether an injury to an individual under the influence of cocaine or heroin could have a sobering effect, and O'Donnell acknowledged that an injury might have such an effect.

At the close of cross-examination, defense counsel asked for, and was granted, a sidebar conference during which she moved for a mistrial. Counsel stated, in support of her motion, that the defense had requested statements by codefendant and had not been tendered

Driskel's statement concerning outside stimulus. The prosecutor, Assistant State's Attorney Joseph McNerney, admitted he had had a telephone conversation with O'Donnell in which O'Donnell related Driskel's statement. McNerney attempted to justify his nondisclosure by arguing, "This is their expert. I assumed that they have had much more time to speak with him ***."

The court ruled:

"I find it was proper cross-examination. I sustained the objections that were to improper questions and also the answers.

\* \* \*

I do not find that the State has violated the discovery by not tendering something when there was an interview of the defense witness. I do not find that it was done in bad faith.

Objection is overruled. Motion for mistrial is overruled. Let's get on with it."

Defense counsel proceeded with redirect examination.

During redirect, O'Donnell said although most people who take illegal drugs do so for the pleasurable effects, addicts or drug-dependent persons take drugs because of "the psychological and/or physical need to take the drugs." O'Donnell indicated the fact that defendant took drugs voluntarily does not mean he was not drug-dependent on the date of the murders.

A defense motion *in limine* to bar Dr. Robert Reifman's testimony was denied. Reifman was called by the State. It was stipulated that Reifman was an expert in the field of psychiatry. Reifman, director of the Psychiatric Institute of the Circuit Court of Cook County, testified that he examined defendant on October 2, 1987. His examination took approximately 45 minutes. As part of his evaluation of defendant, Reifman reviewed police reports, defendant's statements and the report of a psychological examination done by Dr. Karen Smith. Ini-

tially, Reifman determined that defendant was not suffering from a mental disease or defect. Defendant appeared to be "oriented, relevant, coherent, logical. There was no evidence of mental disease." Later, under cross-examination, Reifman conceded that for purposes of statistical manuals, PCP intoxication and cocaine intoxication *are* considered mental disorders (substance abuse syndrome).

The next step in Reifman's examination was to question defendant about the crimes in order to determine what his state of mind was when the crimes were committed. Defendant said he "didn't do it," that he had been home with his mother that evening. He claimed his statements to police were not true and had been contrived to protect his uncle. Defendant had previously told Dr. Smith he had no recollection of the incident. Since defendant denied involvement in his interview with Reifman, Reifman next turned his attention to defendant's drug usage during the relevant time period.

According to defendant, he had been using cocaine, heroin and PCP. Reifman determined defendant had taken drugs voluntarily and was a heavy user who was probably addicted. Nonetheless, Reifman believed there was a "high possibility" defendant was lying about, or exaggerating, the extent of his drug use, as he was telling different stories to different people. Dr. Smith's report indicated defendant had denied using alcohol, cocaine and heroin, although he admitted he had "started" using cocaine before he was arrested. Defendant had told Smith he had tried PCP and did not like it. In any event, irrespective of the seriousness of defendant's involvement with drugs, Reifman believed defendant was not so intoxicated that he could not form intent or conform his conduct to the requirements of the law. Reifman stated:

> "It is my judgment after years of experience that anybody who's so intoxicated that they can't form intent, that that person would not be in a position to commit a crime. They would be so physiologically and mentally incapacitated they couldn't carry out the crime."

According to Reifman, such a person would be "unable to carry out coordinated motoric behavior, unable to coordinate thoughts adequate to performing the tasks which are required in the commission of a crime."

At various times during his testimony, Reifman incorrectly and correctly stated the law with respect to the defense of voluntary intoxication, all the while representing that he was familiar with attendant legal consequences. Asked if voluntary intoxication could be a legal defense, Reifman responded:

> "Not unless it's so chronic that a person is permanently psychotic because of drugs. I don't know of any psychiatric defense, affirmative defense, which includes voluntary intoxication unless it's to the extent the person can't function.
>
> * * *
>
> I'm not aware of voluntary intoxication as a defense against guilt or innocence, responsibility."

Later, under questioning by the prosecutor, Reifman stated, "as far as the affirmative defense is concerned, the only part of that statute of intoxication is that a person who drinks enough voluntarily so he can't form intent." Having *more or less* correctly restated the statutory defense, Dr. Reifman reiterated his personal opinion:

> "If a person is so intoxicated that he couldn't form intent, he would be unable to perform the actions and the coordination and the mental, have the mental astuteness to be able to commit goal-directed activity, a crime, in my opinion."

Dr. Reifman concluded that defendant was able to conform his conduct to the requirements of the law and did not do so because he did not care to.

Following Dr. Reifman's testimony, both sides presented closing arguments. The State intermittently addressed defendant's voluntary intoxication defense, noting first Dr. Reifman's opinion that voluntary intoxication was not a defense in the case, and later referring to defendant's statement: "Without a doubt they intended to kill. He said in his own statement, 'We went there to kill Tiny.' " Defense counsel, in his own closing argument, treated more extensively the defense of voluntary intoxication:

"Obviously somebody, the legislature, felt that you could be intoxicated and act but not act knowingly or intentionally or they never would have created that defense.

And I think it's important that you keep that opinion of Dr. Reifman's in mind when you view the voluntary intoxication defense. If the man thinks it can't exist, he's not going to find it.

\* \* \*

· The one thing I would like for this trial not to become and for your deliberation not to become, ladies and gentlemen, is a battle of the experts. We presented an expert, the State has presented an expert. You are free to accept their testimony, their opinion. You are free to reject it.

And I point out to you, ladies and gentlemen, that you are the ultimate deciders of whether or not Lawrence Jackson was so intoxicated that night that he is entitled to the voluntary intoxication defense. If it were otherwise, we wouldn't have juries in cases like this. We'd just leave it up to the experts.

What I'm saying to you is if you feel that you are not satisfied with Dr. Ziporyn's testimony, if you feel you want to reject it, that is your right, but that does not

necessarily mean that therefore the defendant cannot have the defense available to him.

You've heard the facts. You've heard the opinions. You and only you make the decision.''

At the conclusion of closing arguments, the jury was instructed in the applicable law. Included among those instructions was Illinois Pattern Jury Instructions, Criminal, No. 24—25.02 (2d ed. 1981) (hereinafter IPI Criminal 2d), which reads as follows: ''A drugged person is criminally responsible for his conduct unless his drugged condition renders him incapable of acting knowingly and intentionally.'' The jury returned verdicts of guilty of the murders of Vernita Winder, Dana Winder, Mark Brown and Shirley Martin, the attempted murder and aggravated battery of Urica Winder, the home invasions and armed robberies of each of the five victims and residential burglary. The court entered judgment on the verdicts.

The State indicated it would seek the death penalty and the cause proceeded to the eligibility phase. All of the evidence at the eligibility phase was presented by way of stipulations. It was stipulated that a certified copy of defendant's birth certificate indicated he was 23 years old at the time of the offense, that Dana Winder was four years old when she was murdered, that all of the trial evidence was admissible and could be considered, and that Group Exhibit Nos. 37—A through K consisted of the certified jury verdicts returned in the guilt phase of the trial. On the foregoing evidence, the jury found defendant eligible for death, specifically finding that defendant had murdered two or more persons, that Vernita Winder, Shirley Martin and Mark Brown were killed in the course of another felony, and that Dana Winder was under the age of 12 and her death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.

The cause proceeded to the second phase of the death penalty hearing, the State offering evidence in aggravation. Gigga Bibbs testified that, on the evening of September 28, 1980, she and her seven-month-old daughter were sitting on a bench at a bus stop near Lake Street and Austin Avenue in Chicago when defendant and another man robbed her. During the robbery, defendant grabbed her purse and struck her in the face, bruising her lip. Defendant was apprehended a short distance away from the scene of the robbery, hiding in some weeds. Bibbs identified defendant, and her property was restored to her. Defendant received a three-year sentence for robbery.

Officer Lawrence Beyer of the Chicago police department testified that he was on patrol on September 28, 1980, near Lake Street and Austin Avenue when he was hailed by Gigga Bibbs, who informed him she had just been robbed. Bibbs gave Beyer a description of the perpetrators and Beyer toured the area looking for the robbers. Officer Beyer found defendant nearby, lying among some weeds in an empty lot. Defendant was arrested and, as he was being placed in a police wagon, he told Beyer, "I'm going to kill you and everyone as soon as I get out of here."

It was stipulated that, on October 20, 1980, an information was filed in Cook County charging defendant with armed robbery. On February 5, 1981, defendant was found guilty of the lesser included offense of robbery and was sentenced to three years in the Department of Corrections.

Assistant State's Attorney William Gamboney testified that, in 1981, defendant was charged with "failure to return." Defendant had been serving time in prison on a robbery conviction when, a few months before his release date, he was transferred to a community-based facility designed to help him "assimilate himself" back

into society. One day defendant signed out on a six-hour furlough and never returned. An indictment was filed and a warrant issued for his arrest. On December 15, 1981, defendant was convicted and sentenced to two years in the Department of Corrections.

Officer Joseph Pedersen of the Chicago police department testified that, on September 24, 1980, he responded to a radio message indicating shots had been fired in the vicinity of his patrol car. At 14 North Parkside in Chicago, the officer observed defendant drop a long object over a fence into some bushes. Defendant fit the "clothing description" of the person alleged to have been firing shots. When defendant saw the squad car, defendant proceeded "in a fast pace" north toward Washington Boulevard. Defendant was apprehended and returned to 14 North Parkside, where Officer Pedersen recovered a 410-gauge shotgun from the bushes. On October 7, 1980, defendant did not appear for court as scheduled. His bond was forfeited and a warrant was issued for his arrest.

Francis Higgins, an officer with the Chicago police department, testified that he was on patrol October 24, 1985, when Vincent Rowe flagged Higgins down and related that defendant had burgled Rowe's residence in the Henry Horner Projects, 1900 West Washington. Rowe said he had seen defendant running from the building. Defendant was Rowe's cousin. Among the items reported taken were a receiver, turntable and television. Officers proceeded to defendant's residence, where Higgins stationed himself out of sight near the rear door, and other officers went to the front door. About 20 seconds later, defendant came out the back door. He was arrested and searched. A small kitchen knife was found in his pocket. Later, a witness to the burglary identified defendant as the man she had seen carrying a television in a stairwell of the building on the day of the burglary.

Charges were filed, but were later dropped by the State when the victim chose not to proceed with the case.

Cameron Forbes, a Department of Corrections records officer, testified that defendant was received at Joliet Reception Classification Center on February 27, 1981, with an accompanying mittimus indicating defendant was to serve three years for robbery. Defendant was classified for the Joliet Correctional Center and was transferred there on April 8, 1981. On July 20, 1981, defendant was transferred to the Metro Community Correctional Center, a community-based work release facility, where he remained until August 27, 1981, when he was placed on escape status. On August 27, 1981, defendant signed out of the center to go to a work assignment; he did not return, remaining under escape status until he was returned to Joliet Reception Classification Center on December 18, 1981. Defendant was subsequently transferred to the Pontiac Correctional Center on January 18, 1982, where he remained until his parole on November 15, 1983. He was discharged from parole on November 15, 1985.

Between December of 1981 and November 15, 1983, defendant was cited for 53 disciplinary violations, 31 of which were for unauthorized movement within the correctional facility. The remaining violations were generally of a more serious nature. On December 23, 1981, defendant was cited for attempting to strike a correctional officer with a broom handle. On May 22 and 23, 1982, he was cited for jamming his cell door with a pencil so as to keep the door from locking. A shank (crudely fashioned knife) was found in defendant's cell on August 3, 1982. Defendant approached a teacher, Brian Tessor, on February 3, 1983, telling Tessor he would kill Tessor if he ever saw Tessor on the streets. Defendant waved his hand in Tessor's face, pointed his forefinger at Tessor, and called Tessor a "mother fucker." Defendant was

instructed to leave, but remained in front of Tessor's desk, verbally abusing Tessor. Defendant was again cited for jamming his door open, this time with a piece of paper, on May 12, 1983. On October 11, 1983, defendant refused to provide identification upon the request of a correctional officer. Defendant told the officer, "[Y]ou better get away from me." When asked again, defendant came at the officer as if to swing at him. Moving within inches of the officer's face, defendant said, "[Y]ou'd better just go and get out of here before you get hurt." It was not until a weapon was leveled on defendant from a gun tower that defendant backed away and furnished his identification.

Sandra Thomas, a social worker with the Cook County Department of Corrections, testified as to defendant's conduct while within Cook County's correctional system. Defendant was charged with fighting and gambling on February 13, 1987. Defendant explained that another inmate had been cheating at cards so defendant hit him. On July 8, 1987, defendant was charged with fighting and gang activity. Defendant admitted he was a member of the Vice Lords. Defendant is in fact a *ranking* member of the Vice Lords, a leader in that organization. A shank was found under defendant's mattress on July 29, 1987. Defendant admitted it belonged to him. On August 6, 1987, defendant was cited for fighting with a correctional officer. The officer had ordered defendant to move to a different wing of the facility. Defendant refused and, in the officer's presence, received contraband from another inmate. The officer ordered defendant to turn over the contraband, to which defendant replied, "I ain't giving up shit." Defendant then pushed the officer, who was subsequently treated at Cermak Hospital for injuries to his hands.

In April of 1988, defendant was charged with refusing to obey an order, threats by words and possession of

a weapon. Defendant had refused a search and had told the officer involved that "he and his people would kick [the officer's] ass and any other officers who came to wing 2-J." Defendant called upon other inmates to attack the officers. When other officers arrived on the scene, defendant was searched and a sharp metal object—thought to be a knife—was found on his person. On April 25, 1988, defendant was transferred to a maximum security detention division. On June 7, 1988, defendant was charged with assault for striking another inmate in the eye. Defendant pled guilty to the charge.

Cook County correctional officer Kelly Byrne testified that she had written disciplinary reports concerning defendant on "several" occasions. Some were for fighting; others were for sexual misconduct. Byrne was working midnights on January 21, 1986, and on that date ordered defendant to return to his bunk. Inmates were to be confined to their bunks after midnight. Defendant went to his bunk and, as he lay down, he took his penis from his underwear and began to masturbate while looking directly at Byrne. Byrne left the dormitory and reported the incident. Defendant was removed to segregation for three or four days. When he was returned, he began exposing himself to Byrne almost daily. In April or May of 1986, defendant looked at Byrne and, in an apparently menacing manner, asked how her little girl was doing. Sometime around June of 1986, defendant walked by Byrne and said, "I'll find you and I'll get you." After defendant's remark, Byrne showed her elderly babysitter where Byrne kept her weapon and instructed the woman to use it if anyone tried to enter the house. Byrne began carrying a weapon off duty after defendant was released.

The State rested, and defendant proceeded with evidence in mitigation. Arlene Jackson, defendant's mother, testified that defendant's childhood was, for the most

part, unremarkable. In her own words: "[H]e was a natural son. He was okay you know when he was younger, no problems except kid problems." The family lived in Cabrini Green. Defendant's mother was on public aid; there were two or three Christmases when she was not able to provide presents to her children. In 1966, defendant saw his brother, Edward, killed when a car hit him. Defendant "used to talk about it a lot," but had not recently indicated Edward's death still impacted his life. Defendant's father left in 1968. He went to Oklahoma and has not maintained contact with the family. Defendant "missed him a lot." Defendant started getting in trouble in school around 12 or 13 years of age. He quit high school after one year. When asked why, his mother responded, "I guess he just didn't like going." Defendant helped around the house in his youth. He was, according to his mother, never disobedient, nor did he ever strike her. She did not know about defendant's gang affiliation, nor was she aware defendant was using cocaine, heroin and PCP. Defendant's mother said defendant has a good relationship with other family members. She would rather see him spend the rest of his life in prison than die. She would continue visiting him. Asked if defendant's life meant something to her, she replied, "Yes, he is still my son."

Defendant's brother, Ronald Jackson, testified that he and defendant were "always close" as children. Defendant warned Ronald about drugs and gangs. Ronald was surprised when he learned defendant was using cocaine. Growing up, defendant had tried to help around the house and help take care of the rest of the family. He was always big, so people used to tease him. Sometimes defendant would get mad and "a fight might break out."

Josephine Halmon testified she had known defendant since he was nine years old. She met him when she and her family were moving to a new residence. Defendant

asked if he could help, but she told him he was too small. Thereafter, defendant lived with her "off and on," staying with her son. He looked upon her as a second mother and she treated him as a son. While he lived with her, he helped around the house cooking, cleaning and running errands. He was never any trouble to her. He did not do drugs in her home or engage in gang activity. Halmon said she would feel "hurt" if defendant received the death penalty, but "okay" if his life were spared. She said seeing photographs of the victims would not change her opinion of defendant.

Alicia Jackson, defendant's sister, testified as to her relationship with defendant. For a time, defendant resided with her, her two children, and her husband, Bobbie Driskel. Defendant baby-sat for her while she attended Catherine College. Defendant fed the children, took them to the park, washed their clothes, cooked and cleaned. She was aware defendant used drugs. When defendant was high on cocaine he was "happy *** nothing bothered him *** just sweet." When he was "coming down from the fix of cocaine" he was "down *** moody. Everything irritated him." He essentially had two different personalities.

As a child, defendant was "kind of fat" and, as a result, a lot of kids "messed with him and wanted to jump on him." Notwithstanding, defendant had a "nice attitude," according to his sister, although he was "a loner, kind of quiet, kept to himself." Defendant told her at the time that other kids "kept jumping on him" because "he wouldn't join a gang." When defendant was in his teens, he began stealing and breaking into people's houses in order to get money to buy drugs. He sometimes stole from his own relatives, as was the case when defendant burglarized the residence of Vincent Rowe. Defendant's sister acknowledged that defendant had never had "a real job." Ms. Jackson testified that

defendant warned her and her brother, Ronald, not to use drugs, not to make the same mistakes he had. She said she loved her brother and it would make her happy if the jury spared his life.

After Ms. Jackson's testimony, the defense rested and the State declined the opportunity to present rebuttal. Closing arguments were then had by both sides. Defendant complains of a portion of the State's closing argument in which the prosecutor (1) contended that defendant had already gotten "breaks" from the criminal justice system and did not deserve another, and (2) urged the jury to follow the law and impose the death penalty, noting that defendant "failed to raise mitigating factors *** sufficient to preclude the imposition of the death penalty."

Following closing arguments, the jury was instructed in the applicable law. The court refused to specifically instruct the jurors that drug use and lack of significant criminal history were mitigating factors, or that they could recommend mercy whether or not they found mitigation. Although the court instructed the jury that defendant would receive a sentence of natural life imprisonment if the jury found mitigating factors precluded the imposition of the death penalty, the court refused defense verdict forms which would have reiterated that proposition.

The jury voted to impose the death penalty. Defendant's post-trial motions were denied. As to each count of murder, the court imposed a sentence of death by lethal injection. Defendant received a 60-year sentence of incarceration for the attempted murder of Urica Winder. On the five counts of armed robbery and home invasion, defendant was sentenced to 30 years in the Department of Corrections. He received a 15-year sentence for residential burglary. In this posture, the matter comes before us.

## Voluntary Intoxication Defense

Defendant's stated defense at trial was one of voluntary drug intoxication, although defendant does not contend in this appeal that the State failed to prove him guilty beyond a reasonable doubt as to that issue.

Viewing defendant's evidence on this issue in its entirety, we do not believe defendant presented sufficient evidence to raise voluntary intoxication as an affirmative defense. The circuit court held otherwise and instructed the jury as follows:

> "A drugged person is criminally responsible for his conduct unless his drugged condition renders him incapable of acting knowingly and intentionally." (IPI Criminal 2d No. 24—25.02.)

Notwithstanding submission of this issue to the jury, and taking into account defendant's contentions of error, we cannot—given the evidence in this case—believe that any rational jury would have found defendant's defense credible.

"Intent" and "knowledge" are defined in the Criminal Code of 1961 as follows:

> "Intent. A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." (Ill. Rev. Stat. 1985, ch. 38, par. 4—4.)

> "Knowledge. A person knows, or acts knowingly or with knowledge of:
>
> ***
>
> (b) The result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct.

> Conduct performed knowingly or with knowledge is performed willfully, within the meaning of a statute using

the latter term, unless the statute clearly requires another meaning." (Ill. Rev. Stat. 1985, ch. 38, par. 4—5(b).)

A defendant is presumed to intend the natural and probable consequences of his acts. (*People v. Terrell* (1989), 132 Ill. 2d 178, 204.) The evidence in this case supports that presumption.

In defendant's written and oral statements to the police, he stated he and Driskel went to the projects intending to kill Mark Brown. In his court-reported statement, defendant was asked, "What were you and Disco [Driskel] going to do at the Henry Horner Homes?" Defendant responded, "We both were going to kill Tiny." In his earlier oral statement, defendant said he and Driskel "planned" what they were going to do on the drive to Brown's apartment. Again, in the transcribed statement, defendant was asked, "Prior to knocking on the [apartment] door, did you give [Driskel] anything?" Defendant replied, "Yes. I gave him a knife." The details of defendant's participation within the apartment have been provided previously, and need not be repeated here; however, it is worth noting defendant's statement reveals the implementation of a calculated plan wherein the only adult male in the apartment, Mark Brown, was killed first by both defendant and Driskel, and thereafter defendant forced open a bedroom door to get to witnesses to the murder. Defendant and Driskel then stabbed the women and children until, they believed, no one was left alive to identify them. They then took the property they had come to procure—"We were going to get the money and the video recorder and the T.V."—and they left. In view of defendant's statements, no one would have believed he was incapable of acting intentionally within the meaning of the statute. Ill. Rev. Stat. 1985, ch. 38, par. 4—4 ("his conscious objective or pur-

pose is to accomplish that result or engage in that conduct").

Aside from defendant's explicit statements regarding his intentions, the detail of his recall, as evidenced by his statements, prevents him from establishing a credible voluntary intoxication defense. (See generally *United States ex rel. Burns v. Haws* (N.D. Ill. 1989), 717 F. Supp. 600, 608 (one of the ways in which the State usually succeeds in overcoming a voluntary intoxication defense is "by demonstrating through the accused's own testimony that he or she recalls details before, during, and after the offense").) The detail of his statements to police reveals a person who was acutely aware of his surroundings and actions. Later, when interviewed by Dr. Reifman, defendant said he had been home with his mother when the homicides took place. Still later, defendant told Dr. Ziporyn his recall of events was "very hazy" except for "a recollection at random here or there." Defendant told Dr. O'Donnell he could not remember what happened inside the apartment at 1850 West Washington. Defendant's memory appears to have gotten progressively worse as he attempted to build his intoxication defense. We have no doubt the trier of fact would have seen defendant's defense for what it was, and would have concluded defendant's fading memory was attributable to something other than the passage of time.

The testimony of those who observed defendant during the relevant period of time has also been considered probative on the issue of intoxication. (*People v. Whitehead* (1988), 171 Ill. App. 3d 900, 906 ("Witnesses who conversed with defendant close to the time of the murder observed no conduct indicating he was out of touch with reality").) O.C. Roland observed defendant on the night in question. Roland testified that defendant appeared to have no difficulty speaking, walking or maneu-

vering. Roland had no problems understanding what defendant was saying. Defendant did not say he could not remember where he had been or what he had done. When defendant came out of 1850 West Washington, Roland saw him carrying a television "in one hand." Defendant's other arm was bleeding. When Roland asked what had happened to defendant's arm, defendant replied he had cut it on some glass. Later, Roland asked defendant if he had burgled someone's house. Defendant did not answer; he "just kind of snickered." From Roland's testimony, it would appear defendant was capable of acting intentionally and knowingly.

Finally, Dr. Reifman testified as to his conclusions regarding defendant's mental state. Reifman concluded defendant was not so intoxicated that he could not form intent, *i.e.*, "[a] conscious objective or purpose *** to accomplish [a statutorily proscribed] result or engage in [statutorily proscribed] conduct." (Ill. Rev. Stat. 1985, ch. 38, par. 4—4.) It was Dr. Reifman's experience that anyone who was so intoxicated that he could not form intent would be so physiologically and mentally incapacitated that he would be unable to carry out coordinated motoric behavior and would be unable to coordinate thoughts adequate to performing the tasks required to commit a crime. The person would be unable to perform the actions, and possess the coordination and mental astuteness to commit goal-directed activity. Reifman believes there is no defense of voluntary intoxication unless a person cannot function. Reifman also offered his opinion that defendant was able to conform his conduct to the requirements of the law and did not do so because he did not care to.

In light of the evidence on this issue—or lack of evidence as far as defendant's intoxication "defense" is concerned—we find defendant's voluntary intoxication defense to be wholly without merit. No rational jury

would have believed defendant was incapable of acting intentionally within the meaning of the statute.

## Harmless Error Analysis

In *United States v. Hasting* (1983), 461 U.S. 499, 509, 76 L. Ed. 2d 96, 106, 103 S. Ct. 1974, 1980, the United States Supreme Court reaffirmed its adherence to an analytical approach to judicial review which has streamlined the appellate process and yet preserved the integrity of the system:

> "[T]he Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations [citations]. The goal, as Chief Justice Traynor has noted, is 'to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error.' "

We have found defendant's voluntary intoxication defense to be wholly without merit. Given that finding, it would serve no purpose—other than to unnecessarily lengthen this opinion—to painstakingly analyze each contention of error which relates to the defense of intoxication. Therefore, we will treat these issues at this point in a summary fashion where possible and proceed to other matters.

## 1. State's Expert Testimony and Argument Thereon

Defendant contends that Dr. Reifman misstated the law as to the defense of voluntary intoxication and that the prosecutor reinforced the erroneous statement during closing argument. Defendant relies, for reversal, upon this court's decision in *People v. Haywood* (1980), 82 Ill. 2d 540, wherein conflicting instructions were given—one IPI, one non-IPI—on the issue of voluntary intoxication. This court noted, "IPI Criminal No. 24.02

is a simple, clear and concise statement of the defense of voluntary intoxication. Such instruction needs no embellishment, explanation or further definition \*\*\*." (*Haywood*, 82 Ill. 2d at 545.) This court reversed and remanded for a new trial, stating, "the rule in Illinois is that when conflicting instructions are given, one of which is a correct statement of law and the other is an incorrect statement of law, the error is not harmless." (*Haywood*, 82 Ill. 2d at 545.) Defendant, in this case, concedes that the jury was correctly instructed in the applicable law. Therefore, *Haywood* is inapposite. (See *People v. Gacy* (1984), 103 Ill. 2d 1, 99-100.) Given the state of the evidence, any conceivable error is harmless beyond a reasonable doubt.

## 2. Discovery Issues

We note, as a preliminary matter, that defendant's written discovery motion does not appear in the record on appeal. Supreme Court Rule 412(a) (134 Ill. 2d R. 412(a)) provides in pertinent part, "the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information \*\*\*." Although much of what was not disclosed may indeed have been discoverable, there is nothing in the record to indicate defendant requested it. The State's answer to "defendant's motion to pre-trial discovery," which *does* appear in the record, does not rectify the omission of defendant's written motion, nor does a transcript indicating defendant submitted a written motion in court. Without the written motion, we do not know what was requested of the State. Hence, we do not know what the State was *obligated* to disclose initially, or what it was under a continuing duty to disclose.

While there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without

a specific request (*United States v. Agurs* (1976), 427 U.S. 97, 110, 49 L. Ed. 2d 342, 353-54, 96 S. Ct. 2392, 2401; *People v. Jones* (1977), 66 Ill. 2d 152, 160), cases indicate the evidence is generally exculpatory evidence which would have created a reasonable doubt of defendant's guilt (*Agurs*, 427 U.S. at 112, 49 L. Ed. 2d at 354-55, 96 S. Ct. at 2401-02). That, of course, is not the situation in this case. The evidence in question was inculpatory and defendant essentially had no viable defense anyway.

The trial court may have had before it defendant's discovery motion; we do not. Where the record on appeal is insufficient or does not demonstrate the alleged error, the reviewing court must refrain from supposition and decide accordingly. (*People v. Edwards* (1978), 74 Ill. 2d 1, 7.) Since the record is insufficient, we would not need to proceed further; however, we will address, briefly, the merits of defendant's three discovery issues. As will become apparent, while all three are subject to disposition by harmless error analysis, two could be disposed of on other grounds.

Defendant claims that the prosecution violated discovery rules by withholding statements by defendant, his codefendant, and an expert witness until such time as the statements were to be used against the defense, thereby creating reversible error. Specifically, defendant claims the prosecution failed to disclose (1) a codefendant's statement that the crime had a sobering effect on him, (2) written notes of an interview with a key defense expert witness, including a statement by the witness, elicited on cross-examination, that the defense was weak, and (3) a statement by defendant indicating he remembered details of the crime, thus diminishing his drug intoxication defense.

Defendant's first contention of error concerns a statement which came to light during the cross-examination

of defendant's witness Dr. O'Donnell. The following exchange took place between the prosecutor, McNerney, Dr. O'Donnell, the court and defendant's attorneys:

"MR. McNERNEY: Q. Are you aware, doctor, that an outside stimulus to a person under the influence of say cocaine can have a sobering effect on that individual?

A. I have had that circumstance described to me by one person. .

Q. Who was that person?

MR. SPECTOR: Objection.

THE COURT: You may answer the question.

THE WITNESS: Mr. Driskel.

MR. MILLER: We will renew the objection, Judge.

THE COURT: Objection is not relevant, it will be stricken."

As defendant notes in his brief, "the State's answer to discovery stated that any statements of the codefendant whether written, recorded or oral, and the names of the witnesses present when the statements were made, would be made available to the defense." In our view, for purposes of this appeal, the question is not what the State said it would do, but what it was required by rule to do. Without defendant's written discovery motion, we cannot say with any certainty what the State was obligated to do. Beyond that, the isolated reference to Driskel's statement could not have prejudiced defendant's defense, even assuming, *arguendo*, he had a credible one.

First, defendant assumes that because Driskel had said the excitement of the crime had a sobering effect on him, the jury would assume it had the same effect on defendant. However, this assumption is tenuous at best. Despite defendant's assertions otherwise in his brief, the evidence shows defendant took heroin, whereas there was no evidence suggesting Driskel had. Moreover, defendant was much larger than Driskel and it could be presumed—all other factors being equal—that defendant

could tolerate greater quantities of drugs because of his size. The two were, therefore, not similarly situated for purposes of the comparison. Since this is so, there can be no violation of the rule set forth in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (a codefendant's confession inculpating another defendant cannot be used if codefendant is not subject to cross-examination), because Driskel's statement to O'Donnell does not inculpate defendant.

Second, the court ordered the testimony stricken on relevancy grounds. Although defendant now contends that the court's ruling was confusing, and that the jurors might have thought the "objection" had been "stricken," we think the jurors understood the court's ruling. They were specifically instructed that they should disregard "questions" to which "objections were sustained," and "testimony" which "the court has refused or stricken." (See IPI Criminal 2d No. 1.01.) The jurors were well aware that objections are "sustained" and testimony is "stricken." Moreover, defense counsel apparently did not think the ruling to be so confusing as to require clarification by the court. Where a party, as here, acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby. (*People v. Neal* (1990), 142 Ill. 2d 140, 151-52.) Had defense counsel brought the matter to the court's attention, the court could have made its ruling crystal clear. The error, if any, has been waived. "Otherwise, counsel, by not giving the court the opportunity to prevent or correct error at trial, will gain the advantage of obtaining a reversal through his own failure to act, either intentionally or inadvertently." *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

The same can be said of both the question to Dr. Ziporyn which referred to Ziporyn's statement to an assistant State's Attorney, that Ziporyn "didn't think much of the [intoxication] defense," and defendant's statement

to Roland wherein defendant admitted he had stabbed people in the apartment. These statements could hardly have been revelations to the jury. Defendant's intoxication defense *was not* much of a defense. To be sure, defendant might have enlisted the aid of a different expert had he known of Ziporyn's statement, but in view of defendant's own detailed statements, the testimony of O.C. Roland, and Dr. Reifman's testimony, the result would not have been different. We note, too, that Ziporyn never actually admitted he had made the statement in question. Moreover, the offensive question was withdrawn and the jury was instructed to disregard it. As for defendant's statement to Roland, it was a trivial piece of evidence when compared to defendant's own statements. We conclude any error was harmless.

Before we move on to other matters, we remind the State that a prosecutor's objective should be justice (see *People v. Cornille* (1983), 95 Ill. 2d 497, 512, quoting *Imbler v. Craven* (C.D. Cal. 1969), 298 F. Supp. 795, 809) and that the ends of justice are best served by a system of liberal pretrial discovery which gives both the State and the defendant the maximum possible amount of information with which to prepare their cases (*People v. Hayes* (1990), 139 Ill. 2d 89, 116). "The goals of pretrial discovery in a criminal trial are to promote the search for truth and to eliminate surprise as a trial tactic." (*People v. Boclair* (1987), 119 Ill. 2d 368, 373.) We note, in this case, a disconcerting pattern wherein it *appears* that surprise *may* have been used as a trial tactic by the State. In this case, the state of the record and the evidence were such that reversal is not indicated.

### 3. Alleged Prosecution Error

#### *Jury Selection*

Defendant raises two jury selection issues. First,

defendant questions whether the prosecution gave adequate, race-neutral explanations for excusing black jurors with peremptory challenges. Second, defendant argues that the trial court committed reversible error when it refused to ask prospective jurors whether they would automatically vote for the death penalty.

In the course of jury selection, the State exercised eight peremptory challenges, three against blacks. The final composition of the jury that tried defendant and sentenced him to death was six white males, two white females, one black male, two black females and one Hispanic female.

We turn first to the question of whether a *prima facie* case of purposeful racial discrimination was established by defendant, pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and subsequent decisions of this court. Defendant, understandably, gives this issue scant treatment in his brief, claiming "[t]hat the trial judge recognized that a *prima facie* showing of discrimination had been made is demonstrated by the Court's directive that the prosecution explain the reasons for challenges of prospective black jurors." The trial court's comments do not support defendant's assertion and, if anything, indicate the contrary. At the time the State excused the first black juror, the court, on its own initiative, required the State to give reasons for excusing the juror:

> "I do not wish to run into that issue, an issue, so I'm anticipating an issue. Would you please state the reason that you're excusing that juror?"

Defendant had not raised the *Batson* issue and had not attempted to establish a *prima facie* case of purposeful discrimination. Defendant merely stated, after the State offered reasons for excusing the first two black jurors, that the State's reasons for excusing the first black juror were not "sufficient and neutral," and the reasons for

excusing the second black juror were "not race neutral," and the State's "perception" of the juror was not shared by the defense. The court accepted as valid reasons given by the State for excusing both jurors.

Prior to the conclusion of jury selection, the State took issue with the procedure employed by the court:

"MS. DALEO [Prosecutor]: Judge, while I certainly am concerned with the rights of the defendant in this case and would like to see those protected, I am also interested in the rights of the People in having a fair trial. And my objection comes to the Batson procedure that took place yesterday during jury selection. Batson is clear in saying that there must be an objection by the defense and a prima facie showing by the defense before the State is required to give any reasons for their dismissal of any juror.

We certainly have sufficient reason on every juror that we have excused. My objection comes to the facts that the only persons being brought to the sidebar is the State and it's only when we excuse a black person. We have excused more whites than we have excused blacks in this case, and I—

THE COURT: I'm not asking you to defend any decision that you made.

MS. DALEO: I understand, Judge. I think—

THE COURT: You may continue.

MS. DALEO: It [sic] think it unduly prejudices us in the eyes of the venire that we're about to question, and so if your Honor insists on continuing with the procedure of asking us for reasons without having the defense show any prima facie showing, certainly you run this courtroom, Judge, and I can't argue with that. However, I would ask that this be done in a way so that it doesn't look like it's only the State being called to give explanations for their dismissal of jurors.

THE COURT: Thank you. Do you wish to respond?

MR. SPECTOR: No.

THE COURT: The Court—there is no response from the defense?

' MR. MILLER: We have no response to that, Judge."

The court responded as follows:

"The Court feels that the process that it is using is a proper process. The defense under case law presently, they do not have to indicate reasons for the exclusion. *The Court is not alleging in any way that there is a violation of Batson or that there's an exclusion by the State of black jurors because of the racial makeup,* because of their race only. The Court is anticipating a potential problem that arises on every case since Batson came down in this courtroom every time a black juror is excused and *I wish the opportunity to rule on those exclusions at the time they come up while that juror is present or his memory is clearly present. The Court will continue to do so and not require the defense to do so.*

If the State feels that they have been inconvenienced or prejudiced in any way of potential other jurors, that is their feeling. The Court does not feel it. The Court will attempt to time it where it does not appear to have been simply because a black juror has been excluded, if it is possible to do so. But I do not feel that the procedure I have used has prejudiced the State in any way, and I do not feel that my anticipation of a problem which arises, and it has arisen in every single trial that I have seen in this courtroom or almost in this building that I'm aware, every time a single black juror is excluded when there's a black defendant or another recognizable group. So I wish to anticipate it and rule on it so there will be no such problems." (Emphasis added.)

We have previously cautioned trial courts against collapsing what ought to be a methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions. (*People v. Garrett* (1990), 139 Ill. 2d 189, 201; *People v. Hope* (1990), 137 Ill. 2d 430, 456.) It appears we must now caution trial courts against a procedure whereby the first step in the *Batson* analysis is omitted altogether. We are here concerned with a "peremptory" challenge, which by definition is "[t]he right

to challenge a juror without assigning, or being required to assign, a reason for the challenge." (Black's Law Dictionary 1136 (6th ed. 1990).) The procedure which the trial court employed in this case essentially deprives the State of the right to exercise a peremptory challenge against a black venire member.

Under *Batson*, a defendant must *first* establish a *prima facie* case of purposeful racial discrimination in jury selection by showing that (1) defendant belongs to a racial group capable of being singled out for differential treatment; (2) the State removed members of defendant's race from the venire by using peremptory challenges; and (3) these facts "and any other relevant circumstances raise an inference" of purposeful racial discrimination. (*Hope*, 137 Ill. 2d at 452; *Batson*, 476 U.S. at 93-96, 90 L. Ed. 2d at 85-88, 106 S. Ct. at 1721-22.) Examples of possible "relevant circumstances" include (1) a pattern of strikes against black venire members; (2) disproportionate use of strikes against such members; (3) whether the excluded blacks were a heterogenous group sharing race as their only common character; (4) the level of black representation in the venire as compared to the jury; (5) prosecutorial questions and statements during *voir dire* and while exercising challenges; and (6) the races of defendant and victim or of defendant and witnesses. *Garrett*, 139 Ill. 2d at 203; *Hope*, 137 Ill. 2d at 453; *People v. Evans* (1988), 125 Ill. 2d 50, 64.

None of these circumstances are evident in the record before us. The defense raised nothing which would have warranted the court's action, compelling the State to give reasons for its exercise of peremptory challenges against blacks. The defense failed to make a *prima facie* showing of purposeful racial discrimination. In fact, the only significant response the defense gave to the reasons offered by the State was with respect to the third black

juror excused, Carolyn Larkin. The prosecutor stated that the prospective juror had a "very visible reaction" when death was mentioned as a possible sentence. Moreover, she seemed "anxious" and "apparently" in "fear of potential retribution from the defendant or relatives or witnesses for the defense." The prospective juror had indeed asked a question to that effect: "Don't nobody come out to your house after I leave here, won't nobody follow me home." Defense counsel, although conceding that Larkin was nervous, claimed he noticed no emotional response when the death penalty was mentioned.

The court found, as it had with the other blacks excused, that the "exclusion of [the] juror was for reasons other than race." The court considered the reasons proffered by the State and found them to be acceptable. Beyond that, the court's comments make clear that it never questioned the State's motivation for excusing black jurors. In effect, the court did not believe the defense had established a *prima facie* case of racial discrimination. In addition to comments we have already cited, we note the court's statements at the hearing on defendant's post-trial motion:

> "The Court believes that there was no violation of the State in the use of peremptory challenges to excuse black veniremen from the jury. The Court went to extremes to insure that this issue would not come up in this case, even when the defense did not make a motion or question, the Court required the prosecution in this case to give a reason for each exclusion of black jurors on this case before any issue arose. It did not do so because it suspected anything but it did so to insure there would be no question by the reviewing court of the procedures and the reasons for the exclusion of jurors on this case.
>
> The Court went to extremes to insure and specifically found that there were racially neutral reasons for excluding the veniremen that were excluded."

Indeed, the court went to extremes. The prosecution in this case should not have been required to justify its use of peremptory challenges against blacks.

However, it should be noted that when a prosecutor defends his use of peremptory strikes *without* any prompting from the trial court, the court has no occasion to rule whether the defendant has or has not made a *prima facie* showing of intentional discrimination. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." *Hernandez v. New York* (1991), 500 U.S. ___, ___, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.

In any event, the trial court did not err in accepting the prosecutor's explanations for the peremptory challenges. This court will usually accord great deference to the trial court's findings. (*People v. Morgan* (1991), 142 Ill. 2d 410, 435-36; *Hope*, 137 Ill. 2d at 467.) Although the defendant contends that "the validity of the prosecution's explanations is subject to debate as to the last two black women excluded," defendant also maintains that the court erred in accepting the State's justification for the peremptory challenge of Ruby Lewis, the first black excused by the State. The prosecutor attempted to justify his use of a challenge against Ruby Lewis by noting (1) she lived on the west side of Chicago, the area where the crime occurred and, according to the prosecutor, the most violent community in the city; (2) she was dressed inappropriately for court (tennis shoes and a dress); (3) the manner in which she answered questions regarding fairness to defendant; and (4) she was one of two jurors who "nodded off" during the reading of the charges. The court rejected the prosecutor's contention concern-

ing violence on the west side, but found the prosecutor had proffered other "very valid reasons."

As for the second black excused, Devon Overstreet, there is little question that her prior criminal history justified excusing her. Nor is there much question that Carolyn Larkin could be excused by peremptory challenge because she was anxious and appeared to fear possible retribution at the hands of defendant, his relatives or witnesses.

Unless the decision of the court is against the manifest weight of the evidence, the question of whether or not the prosecutor was credible in offering his or her reasons is a question best left to the trial judge, who is in the best position to determine credibility. (*Morgan*, 142 Ill. 2d at 436; *Hope*, 137 Ill. 2d at 467.) After reviewing the record, we cannot say that the decision of the trial court was against the manifest weight of the evidence.

### Victim Impact Testimony

Defendant next contends that the prosecution prejudiced the jury at both the guilt and sentencing phases of trial by eliciting irrelevant victim impact testimony. According to defendant, the prosecution used its first witness at sentencing, Dorothy Brown, "to highlight the trauma that the victim's families had suffered." She testified that her son, Mark Brown, had been a twin, and that Mark's twin had died two days after birth. An objection to the testimony regarding the death of the twin was sustained and the jury was instructed to disregard it. Brown testified she had a husband and four children other than Mark. She said Mark and Vernita Winder were to have been married and had one child, Shanita, who had been less than one year old when her parents were murdered. Brown testified, over objection, that she was employed in a nursing home. An objection was sus-

tained as to her testimony that she had previously worked as a nurse's aid. Brown was then asked by the prosecutor about events which transpired after she had received word of her son's death and had gone to the building where he had resided:

"Q. Where did you go to when you got up to the second floor?

A. In front of my son's apartment.

Q. And what happened in front of your son's apartment?

A. I passed out.

Q. And when you say pass out, you mean you fell to the ground unconscious?

A. Yes.

Q. Was that after someone had said something to you?

A. Yes.

Q. Was that a police officer that said that?

A. Yes.

Q. Now, what was your husband doing after you passed out?

A. I don't know. He was leaning over me, which I woke up and an ambulance was there to take me to the hospital, but I wouldn't go.

Q. What happened after you refused to be taken to the hospital by the ambulance?

A. Well, they were newspaper people trying to ask me questions and there was the police.

Q. Now, subsequently did you go to the Medical Examiner's Office?

A. Yes.

Q. And would you please tell the ladies and gentlemen of the jury who you went to the Medical Examiner's Office with, if you can recall?

A. My husband and my children.

Q. And would you please relate to the ladies and gentlemen of the jury what occurred when you went to the Medical Examiner's Office?

A. I seed [sic] my son.

Q. And where did you see your son?

A. Behind a glass.

Q. For how long a period of time did you see your son?

A. Not long.

Q. Why not?

A. I passed out again."

Brown later testified, over objection, that Mark had made it public knowledge that he had been saving money to purchase a car.

As the State correctly notes with respect to defendant's first allegation of error, the assistant State's Attorney asked no questions concerning Mark Brown's twin and twice attempted, unsuccessfully, to interrupt Brown when she began testifying about the twin's death. The isolated reference was not deliberately elicited, was never repeated again, an objection thereto was sustained, and the testimony was stricken and the jury instructed to disregard it. Where a timely objection is made to improper interrogation, the court can, by sustaining the objection or instructing the jury to disregard the answer, usually cure the error. (*People v. Herrett* (1990), 137 Ill. 2d 195, 215; *Carlson*, 79 Ill. 2d at 577.) The court cured any error here.

Although we see no obvious relevance to the prosecutor's questioning regarding, and Brown's reference to, her husband and four other children, defendant has waived the alleged error by failing to make a timely objection at trial. (*Herrett*, 137 Ill. 2d at 207.) Moreover, it is inconceivable that defendant would have suffered prejudice as a result of the incidental reference. See *People v. Del Vecchio* (1989), 129 Ill. 2d 265, 287-89.

As for testimony concerning Vernita Winder's children, and the relationship between Vernita and Mark Brown, that testimony was relevant, providing a reason for their presence together at the apartment where the

murders occurred. (See *People v. Jimerson* (1989), 127 Ill. 2d 12, 42.) We note, too, that defense counsel made no objection to testimony of the Brown-Winder relationship, a circumstance which further distinguishes this case from *People v. Hope* (1986), 116 Ill. 2d 265, cited by defendant. *Jimerson*, 127 Ill. 2d at 41.

We reject defendant's claim of error founded upon Brown's testimony that she had previously worked as a nurse's aid and was, at the time of trial, employed at a nursing home. An objection was sustained to the former response, curing any conceivable error. (*Carlson*, 79 Ill. 2d at 577.) Moreover, it is stretching the bounds of reasonable argument to contend that defendant was prejudiced by Brown's testimony concerning her previous employment. We make the same observation with respect to testimony concerning her employment at the time of trial.

We believe Brown's references to her fainting were waived because counsel failed to object thereto. (*Herrett*, 137 Ill. 2d at 207.) Moreover, in the context of this case, the statements were harmless. The prosecution did not dwell upon this testimony, which was presented during the guilt phase of defendant's trial. We find the testimony to be harmless error. See generally *Del Vecchio*, 129 Ill. 2d at 287-89.

Finally, we reject out of hand the notion that testimony concerning Mark Brown's saving money to purchase a car constituted error. Just prior to the testimony in question, Brown had testified that Mark Brown and Bobbie Driskel had been in contact with each other and that "just about everybody knew" about the money. Defendant's statement to police refers to "the money." We believe this testimony was highly relevant.

Defendant points to other instances of alleged improper victim impact testimony: the testimony of Vernita Winder's sister, naming three other sisters; and Shirley

Martin's aunt's testimony wherein she made reference to (1) Shirley's son, Michael, (2) the fact that Shirley and Vernita were about to get their GEDs, and (3) her observations at the scene of the murder. We find all of these references to be incidental and harmless: harmless at the guilt phase because defendant essentially had no credible defense; harmless for purposes of the sentencing phase because of the sheer weight of other evidence.

### Prosecutorial Argument

Defendant complains of the prosecutor's closing argument at sentencing, wherein the prosecutor (1) argued that defendant had previously gotten "breaks" from the criminal justice system and urged the jury not to "give him another break," and (2) urged the jury to follow the law and return a death verdict.

With respect to his first contention, defendant poses two questions which he thereafter answers in the negative: "Should Mr. Jackson be sentenced to death to correct the errors of judges and correctional officials? Do past light sentences suggest the need for the death penalty rather than life in prison?" The State counters that the question raised by the prosecutor's argument was and should be: "Should the jury be allowed to consider that defendant failed to take advantage of the opportunities given him to rehabilitate himself?"

As the State notes, this court has held that a prosecutor may ask a sentencing jury to consider a defendant's criminal history and lack of positive response to his incarceration in making its decision. (*People v. Brisbon* (1989), 129 Ill. 2d 200, 209.) The prosecutor in *Brisbon* made reference to punishment previously imposed, observed that prior sentences had not "slowed him [defendant] down one bit," and concluded defendant had "no potential to be rehabilitated." (*Brisbon*, 129 Ill. 2d

at 207.) This court found that the prosecutor's remarks were "permissible." *Brisbon*, 129 Ill. 2d at 209.

We so find in the case at bar. As in *Brisbon*, the prosecutor in this case asked the jury to consider defendant's criminal history and defendant's lack of positive response to the opportunities he had been given to rehabilitate himself. The prosecutor's remarks do not constitute error.

Nor do we find error in the prosecutor's exhortation to the jury, urging jurors to follow the law and return a verdict of death. These remarks, examined in the context of the entire proceeding (see *Herrett*, 137 Ill. 2d at 211), were clearly proper.

In his opening statement to the jury at the second phase of the death penalty hearing, defense counsel asked the jury to have "compassion" for defendant and rise above "barbarism." In closing argument, defense counsel told the jury, "If you do impose the death penalty you got to be prepared to leave here today and tell anybody you meet *** I killed somebody today." An objection was sustained and the jury was instructed to disregard the comment. Later, counsel stated, "there have been four senseless, terrible, useless killings. Don't make it five." She told the jury, "If [defendant] dies *** part of you will die." She concluded by telling the jurors that they would have to account to their maker for the decision they reached. An objection to that comment was sustained.

The prosecutor responded by reminding the jurors to look to the evidence adduced at the sentencing hearing, and to follow the law and their oaths:

> "Please follow your oaths as jurors. The defense has failed to raise mitigating factors which are sufficient to preclude the imposition of the death penalty.

It's your duty to follow the law and oaths, ladies and gentlemen, and sign the verdict you unanimously find no mitigating factors which are sufficient.

\* \* \*

I suggest that the law requires that you follow the instructions that the Judge will give you, and that you sign the verdict form finding no mitigating factors sufficient to preclude the imposition of the death penalty."

A defendant may not claim prejudice from comments by the prosecutor which were invited by the earlier argument of the defendant. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 454.) During arguments, defense counsel departed from a discussion of mitigating circumstances and attempted to create in the jurors a sense of guilt which would preclude their imposition of the death penalty. By this departure, defense counsel invited the prosecutor's response, reminding the jury to consider mitigating factors and follow the law. The exhortation to find for the death penalty was clearly based upon the prosecutor's assessment of the evidence and was therefore proper. Similar arguments urging jurors to "follow the law"— and denying that they were instruments of violence— were upheld as proper in *People v. Mahaffey* (1989), 128 Ill. 2d 388, 428-29. The substantial latitude generally afforded the prosecutor in argument (see *Morgan*, 142 Ill. 2d at 452-53) was not exceeded here.

## 4. Alleged Errors of Trial Court

### *Automatic Vote Death Penalty*

We next address defendant's contention that the trial court committed reversible error when it refused to ask prospective jurors whether they would automatically vote for the death penalty. This court has previously spoken to this very issue in another case and thus, that decision is controlling.

In *Morgan*, defendant contended, as does defendant in this case, that he was denied an impartial jury when the trial court refused to ask potential jurors if they would automatically impose the death penalty if they found the defendant guilty. (*Morgan*, 142 Ill. 2d at 469.) Defendant in *Morgan* requested that the trial court ask prospective jurors: "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are." The trial court denied the request. This court in *Morgan*, quoting *People v. Brisbon* (1985), 106 Ill. 2d 342, 359, stated " 'there is no "reverse-*Witherspoon*" rule that requires the trial court to "life qualify" a jury to exclude all jurors who believe that the death penalty should be imposed in every murder case.' " (*Morgan*, 142 Ill. 2d at 469.) Further, this court noted that Morgan had "not demonstrated, or even suggested, that any of the actual jurors on his jury were biased towards the death penalty." *Morgan*, 142 Ill. 2d at 469, citing *People v. Caballero* (1984), 102 Ill. 2d 23, 46.

Defendant, in the instant case, argues that the United States Supreme Court's decision in *Ross v. Oklahoma* (1988), 487 U.S. 81, 101 L. Ed. 2d 80, 108 S. Ct. 2273, requires the giving of the "life-qualifying" or "reverse-*Witherspoon*" question when sought by the defense in a capital case. In *Ross*, a prospective juror stated that he would automatically vote for the death penalty if the defendant were found guilty. The trial court refused to excuse the prospective juror for cause, and the defendant used a peremptory challenge to remove the prospective juror. (*Ross*, 487 U.S. at 83-85, 101 L. Ed. 2d at 86-87, 108 S. Ct. at 2275-76.) The Supreme Court found that although it was error not to excuse the prospective juror for cause, the death sentence need not be reversed, as there was no showing that any juror on

defendant's jury was not impartial. *Ross*, 487 U.S. at 91, 101 L. Ed. 2d at 92, 108 S. Ct. at 2280.

This court, in *Morgan*, noted the decision in *Ross* and, under circumstances virtually identical to those in this case, rejected the contention defendant raises in this appeal, stating:

> "In this case, the defendant's jury was selected from a fair cross-section of the community, each juror swore to uphold the law regardless of his or her personal feelings, and no juror expressed any views that would call his or her impartiality into question. Thus, as there was no showing that any actual juror on the defendant's jury was partial, the sentence is valid." (*Morgan*, 142 Ill. 2d at 470.)

The decision in *Morgan* compels a similar holding in the case at bar.

We do not, by our decision here, mean to imply that the "reverse-*Witherspoon*" question is inappropriate. Indeed, given the type of scrutiny capital cases receive on review, one would think trial courts would go out of their way to afford a defendant every possible safeguard. The "reverse-*Witherspoon*" question may not be the only means of ensuring defendant an impartial jury, but it is certainly the most direct. The best way to ensure that a prospective juror would not automatically vote for the death penalty is to ask. Having said that, we reiterate our finding that no partiality was demonstrated in this case, and we adhere to our holding in *Morgan*.

### *Instructions and Comments to the Jury*

Defendant raises several issues which relate to instructions and comments the court made to the jury. Defendant claims that reversal is required because (1) the trial court stated before the jury during the death penalty hearing that "the jury does not impose the sen-

tence"; (2) the trial court refused to modify sentencing verdict forms and to instruct the jury at the eligibility phase of the death penalty hearing that the only alternative to death was life in prison without parole; (3) the court refused to instruct the sentencing jury that drug use and lack of a significant criminal history were mitigating, and that the jury could recommend mercy whether or not it found mitigation; and (4) defendant was erroneously found eligible for the death penalty based upon murder in the course of residential burglary.

Citing *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633, defendant argues that an isolated statement of the trial court, indicating that the jury would not *impose* the sentence, "misled the jury to believe that it did not have the final responsibility for the penalty." Defendant's argument is meritless.

In *Caldwell*, the prosecution told the sentencing jury that its decision would be subject to automatic review, implying that the responsibility for determining the appropriateness of the death sentence rested elsewhere. (*Caldwell*, 472 U.S. at 325-26, 86 L. Ed. 2d at 237, 105 S. Ct. at 2637-38.) In this case, the jurors were repeatedly told the life-and-death decision was theirs. The prosecutor and defense counsel, in their opening statements, made this clear to the jurors:

> "What you will decide at the end of this aggravation and mitigation proceeding is whether there is a—any mitigating factor sufficient to preclude the imposition of the death sentence.
>
> * * *
>
> You, as jurors, have the power to determine whether or not Lawrence Jackson lives or dies.
>
> * * *
>
> And remember, the decision that you make at the close of this hearing, you must make and live with that decision for the rest of your lives."

This theme was revisited during closing arguments:

"You must decide *** there are no mitigating factors sufficient to preclude the imposition of the death sentence.

* * *

Only this jury, only you twelve people can decide whether he lives or dies. The People of the State of Illinois through Richard Daley, Paula Daleo, Joe McNerney, Joe Barbaro, they cannot decide.

Only you can decide. Judge Joseph Urso can't decide. Only you can decide.

* * *

If you sign the death penalty verdict today that verdict is for keeps."

The jury was also apprised by defense counsel of the procedure whereby the jury returns a verdict for death and the judge imposes the sentence:

"If you unanimously decide there are [no mitigating factors] then you will be instructed the Court shall sentence the defendant to death.

* * *

If you sign a verdict for the death penalty you set a chain of events in motion. Judge Urso signs an order that Lawrence Jackson shall be put to death."

The jury was instructed by the court:

"At this hearing you will determine whether the defendant will be sentenced to death.

* * *

You are to apply the law to the facts and in this way decide whether the defendant will be sentenced to death."

We believe the jurors were aware of their responsibility and knew that they alone would decide whether defendant lived or died.

Moreover, we find adequate steps were taken to inform the jury that natural life without parole was the only alternative disposition. At the sentencing phase of

the death penalty hearing, the trial court instructed the jury:

> "Under the law the defendant shall be sentenced to death if you unanimously find that there were no mitigating factors sufficient to preclude the imposition of the death sentence. If you are unable to unanimously find that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the defendant will be sentenced to natural life imprisonment.
>
> And no person serving a term of natural life imprisonment can be paroled or released except through executive clemency."

The instruction given was essentially IPI Criminal 2d No. 7C.05 (Supp. 1989). The instruction embodies the views expressed by this court in *People v. Gacho* (1988), 122 Ill. 2d 221. This instruction alone, given at the sentencing phase of a death penalty hearing, is sufficient, under the circumstances of this case, to inform the jury that life in prison without parole is the only alternative to death.

We reject defendant's contentions that this instruction should have been given at the eligibility phase and that the sentencing verdict forms should have been modified. Defendant cites no authority which would mandate these measures, nor are we aware of any. With respect to defendant's former contention, we note that the ultimate sentence to be imposed would be irrelevant at the first stage of a death penalty hearing where the jury determines only whether defendant is eligible for the death sentence, not whether it is actually to be imposed. We find no error here.

We reject, too, defendant's contention that the court erred when it refused to instruct the sentencing jury that lack of significant criminal history and drug use were mitigating, and that the jury could recommend mercy whether or not it found mitigation. First, it ap-

pears to us that defendant *had* a significant criminal history; therefore, an instruction such as he suggests would not have been proper. Defendant was 23 years old when he committed these murders. Defendant, a chronic drug user, said he began selling heroin and cocaine at age 15. He was convicted of robbery in 1981 and was sentenced to three years in the Department of Corrections. Defendant's second felony conviction, for "failure to return" from furlough, followed 14 months later. Defendant's sister testified that defendant sometimes broke into residences to get money to buy drugs. She admitted she knew defendant had burgled Vincent Rowe's residence. Under the circumstances, instructing the jury regarding "lack of significant criminal history" would have been inappropriate.

As for defendant's remaining contentions regarding instructions concerning drug use and recommendations of mercy, we note, as defendant has, that this court has previously held nonstatutory mitigating factors need not be specified in an instruction when the jury is instructed that it may consider any relevant mitigation (*People v. Free* (1983), 94 Ill. 2d 378, 420), and a mercy instruction need not be given for the same reason (*People v. Sanchez* (1986), 115 Ill. 2d 238, 269-70). We decline the defendant's invitation to reconsider these holdings.

### Allegedly Unreliable Aggravation

Defendant claims that "unreliable aggravation was used to obtain the death penalty when testimony that Mr. Jackson had committed a residential burglary was introduced although the residential burglary charged had been *nolle prossed.*"

At the second phase of defendant's death penalty hearing, Officer Francis Higgins testified that he was on patrol on October 24, 1985, when he was flagged down by defendant's cousin, Vincent Rowe. Rowe said defend-

ant had burgled his residence; Rowe said he had seen defendant running from the building. A television was among the items taken. Officers proceeded to defendant's residence, where Higgins stationed himself out of sight near the rear door, and other officers went to the front door. About 20 seconds later, defendant came out the back door and was arrested. Defendant was returned to the scene of the burglary where he was identified by a Ms. Young as the man she had seen earlier, carrying a television down a stairwell. Higgins affirmed that the State had dropped charges, apparently because the victim chose not to proceed with the case. Defendant's sister later testified that she was aware defendant had burgled the residence of her cousin, Vincent Rowe.

Hearsay evidence of crimes that did not result in prosecution or conviction is admissible at the aggravation and mitigation phase of a death penalty hearing if the evidence meets the requirements of relevancy and reliability. (*People v. Young* (1989), 128 Ill. 2d 1, 53-54.) The evaluation of testimony's relevance and reliability is left largely to the sentencing judge's discretion. *People v. Richardson* (1988), 123 Ill. 2d 322, 361-62; *Brisbon*, 106 Ill. 2d at 365.

We cannot say, after having examined the record, that the trial court abused its discretion when it admitted Higgins' testimony. Vincent Rowe made a complaint to Higgins, indicating that (1) his residence had been burgled, (2) a television was among the items taken, and (3) he had seen defendant running from his building. Higgins later apprehended defendant under circumstances strongly suggesting that defendant was attempting to evade police officers at his front door. Rowe's allegations against defendant were supported by Young's identification of defendant as the man she had earlier seen carrying a television down a stairwell in Rowe's building. Finally, defendant's sister acknowledged she

was aware defendant had committed the burglary, although she did not disclose the source of her information. Higgins' testimony appears to be relevant and reliable.

*People v. Harris* (1989), 129 Ill. 2d 123, cited by defendant, is distinguishable. At issue in *Harris* was admission, at a death sentencing hearing, of some evidence which implicated defendant in a 1969 killing. Although there was *some* inculpatory evidence against defendant, there was substantial evidence which exculpated defendant—evidence which had prompted the State to drop charges against defendant. This court held that it was error to admit evidence of the 1969 incident and error to exclude evidence of the prosecutor's reasons for dropping charges. *Harris*, 129 Ill. 2d at 163.

*Harris* does not stand for the proposition that evidence underlying a charge subsequently dropped can never be used at sentencing. The basis for the decision in *Harris* was substantial evidence that defendant had not committed the crime, evidence which convinced the prosecutor that charges should be dropped.

There was no such evidence in this case. To the contrary, substantial evidence implicated defendant. It appears that the charges against defendant were dropped because the victim, defendant's cousin, chose not to proceed against defendant. Under the circumstances, we cannot say this evidence was unreliable.

### 5. Instruction Including Residential Burglary

Finally, we address defendant's contention that he was erroneously found eligible for the death penalty based upon murder in the course of residential burglary. The sentencing jury was instructed that defendant would be eligible for the death sentence if it found (1) that defendant was 18 years old or older at the time of the commission of the murders, and (2) that *one or more* statutory

aggravating factors existed. (See IPI Criminal 2d No. 7A.11.) The jury subsequently returned verdicts finding eligibility for death based upon *several* aggravating factors: (1) defendant murdered two or more persons; (2) defendant killed Dana Winder, who was under 12 years of age and whose death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty; (3) defendant killed Vernita Winder in the course of another felony; (4) defendant killed Shirley Martin in the course of another felony; and (5) defendant killed Mark Brown in the course of another felony. The jury was instructed that the predicate felonies in this case were armed robbery, home invasion and residential burglary. This court has held that murder in the course of residential burglary does not establish eligibility for the death penalty. *People v. Chandler* (1989), 129 Ill. 2d 233, 250, 256.

Although residential burglary may not be a proper predicate felony, armed robbery and home invasion were. Defendant was found guilty of five counts of armed robbery and home invasion by the same jury that determined eligibility. The jury would have found defendant had killed in the course of another felony, even if residential burglary had been omitted from the instructions. Defendant was not prejudiced by the erroneous inclusion of residential burglary in the instructions. See *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 375 (presence of other aggravating factors made alleged error at eligibility phase harmless); *People v. Coleman* (1989), 129 Ill. 2d 321, 345 ("Illinois statute does not place special emphasis on any aggravating factor and does not accord added significance to multiple aggravating factors").

In a related argument, defendant claims that the "improper basis of eligibility" was used to prejudice him at the second stage of the death penalty hearing. We disagree. Defendant *had* engaged in conduct which resulted in a residential burglary conviction, therefore the jury

could consider that conduct at the sentencing phase even if it was not proper to do so at the eligibility phase. *Coleman*, 129 Ill. 2d at 346 ("During the second phase of the sentencing hearing, the jury was free to consider any relevant and reliable evidence in aggravation and mitigation").

In *People v. Simms* (1991), 143 Ill. 2d 154, the jury was also incorrectly instructed that residential burglary was one of the predicate felonies for imposition of the death sentence. Although this court vacated the death penalty in that case, we find the case at bar to be distinguishable from *Simms*.

The *Simms* jury returned a general verdict form. "The signed verdict form simply stated that the jury unanimously found that a statutory aggravating factor existed, without specifying which underlying felony or felonies the jury relied upon to establish the defendant's eligibility for death." *Simms*, 143 Ill. 2d at 171.

Here, five specific verdict forms were utilized by the jury to find defendant eligible for the death sentence, each based upon an aggravating factor. While three of those verdict forms could be termed "defective" because the aggravating factors included residential burglary as one of the predicate felonies, the remaining two verdict forms listed as the aggravating factors (1) that the defendant murdered two or more persons; and (2) defendant killed Dana Winder, who was under 12 years of age and whose death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty. In order to find eligibility for imposition of the death penalty, the jury had only to sign *one* of those verdict forms while it did, in fact, sign all five.

Thus, the fact that three of those five verdict forms were not entirely correct is not "sufficiently grave as to have deprived the defendant of a fair sentencing hearing." (*Simms*, 143 Ill. 2d at 170.) Thus, the defendant

would still have been eligible for the death penalty had the three "incorrect" verdict forms never been signed by the jury.

### 6. Alleged Disparate Sentencing

Defendant argues that his death sentence is "unreasonably disparate from his codefendant's life sentence when his codefendant, who had committed a prior murder, initiated the murders and participated in the stabbings."

It is the duty of this court, under both the United States and Illinois Constitutions, to determine whether a death sentence has been imposed arbitrarily or capriciously or is unduly severe considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. (*People v. Bean* (1990), 137 Ill. 2d 65, 134.) As a means to that end, this court has compared a defendant's death sentence to the sentence of a codefendant (*Bean*, 137 Ill. 2d at 134; *Jimerson*, 127 Ill. 2d at 54; *People v. Gleckler* (1980), 82 Ill. 2d 145, 161-71), focusing on the particular defendant's extent of involvement in the offense, the nature of the offense, the character and background of the defendant, including any criminal record, and his potential for rehabilitation (*Bean*, 137 Ill. 2d at 134; *Gleckler*, 82 Ill. 2d at 162-66, 170-71). Arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. *People v. Kline* (1982), 92 Ill. 2d 490, 508; *People v. Godinez* (1982), 91 Ill. 2d 47, 55.

The basic premises of defendant's disparate-sentencing argument are (1) that Driskel's background "contained more aggravation" than defendant's background, and (2) that Driskel was at least as culpable. We first compare the backgrounds of defendant and Driskel for whatever insight into their character we may derive.

As the State points out, both defendant and Driskel had two prior felony convictions: defendant for robbery and failure to return from furlough; Driskel for burglary and robbery. Driskel also had a disorderly conduct conviction. Both had been arrested—Driskel for theft, defendant for burglary—and had had charges dropped. Not to be lightly regarded, however, is testimony that Driskel had committed a murder in the course of a burglary when he was a juvenile. Assuming the jury believed the testimony of Driskel's accomplice, the fact that Driskel had killed before is a weighty factor indeed. We do not, of course, know whether the jury accepted or rejected this testimony. We do find it somewhat odd that the State chose not to present other witnesses on this point. In any event, this is not the only evidence we must take into consideration.

Defendant observes, "Among the things that codefendants Bobbie Driskel and Lawrence Jackson have in common are drug addiction, coming from large poor broken families, childhood trauma, poor school records and bad behavior in jail."

The State points out that while both men were drug addicts, at age 18 Driskel sought treatment through a TASC program, but was denied access. Nothing of record indicates defendant ever sought treatment. While defendant's father had abandoned the family, Driskel's father was an alcoholic who physically abused everyone in the family. Defendant, as a child, had seen his older brother killed by an automobile, but defendant's mother testified that defendant had not indicated the event still had an impact on his life. Driskel had been given an overdose of LSD by a teacher and was twice hospitalized for psychotic behavior.

Although Driskel's record while incarcerated was not impeccable, it was far better than defendant's. While in Cook County jail, Driskel was disciplined for possessing

"shanks," once kicked another inmate in the face during a fight, and was cited for fighting on another occasion. On the other hand, Driskel received his GED during his first incarceration and left Joliet with the highest status, Grade A. Driskel later took courses at Wright College and completed a program in truck driving. While awaiting trial in this case, Driskel attended classes and counseled with a minister. Driskel displayed a propensity for self-improvement.

Driskel had also had a degree of success in the workplace. Between 1980 and 1986, Driskel held jobs with the Urban Progress Center, the Urban Restoration Conservation Program, Hagerty Service and Vulcan Company. The manager of Vulcan testified that Driskel was a good and reliable employee who worked hard. He admitted, however, that Driskel had been dismissed for taking property from a customer.

Contrast defendant's institutional record, educational aspirations and work history. Defendant was cited for 53 disciplinary violations while in the State's correctional system between December of 1981 and November 15, 1983. Although many violations were for relatively minor things, such as unauthorized movement and jamming open cell doors so they would not lock, the remaining violations were of a more serious nature. On December 23, 1981, defendant was cited for attempting to strike a correctional officer with a broom handle. A shank was found in defendant's cell on August 3, 1982. On February 3, 1983, defendant approached a teacher, Brian Tessor, telling Tessor he would kill him if he ever saw him on the streets. Defendant waived his hand in Tessor's face, pointed his forefinger at him, and called Tessor a "mother fucker." On October 11, 1983, defendant refused to provide identification upon request of a correctional officer, telling the officer, "you better get away from me." When asked again, defendant came at the officer as if to swing

at him. Then, moving within inches of the officer's face, defendant said, "You'd better just go and get out of here before you get hurt." It was not until a weapon was leveled on defendant from a gun tower that defendant backed away.

Defendant was cited for numerous disciplinary violations while in Cook County's correctional system, awaiting the outcome of this case. Defendant was charged with fighting and gambling on February 13, 1987. Defendant explained that another inmate had been cheating at cards so defendant hit him. On July 8, 1987, defendant was charged with fighting and gang activity. Defendant admitted he was a member of the Vice Lords. He was in fact a leader in that organization. A shank was found under defendant's mattress on July 29, 1987. On August 6, 1987, defendant was cited for fighting with a correctional officer. The officer had ordered defendant to move to a different wing of the facility. Defendant refused and, in the officer's presence, received contraband from another inmate. The officer ordered defendant to turn over the contraband, to which defendant replied, "I ain't giving up shit." Defendant then pushed the officer who was subsequently treated at a hospital for injuries to his hands. In April of 1988, defendant was charged with refusing to obey an order, threats by words and possession of a weapon. Defendant had refused a search and had told the officer involved that, "he and his people would kick [the officer's] ass and any other officers who came to wing 2-J." Defendant called upon other inmates to attack the officers. When other officers arrived on the scene, defendant was searched and a sharp metal object—thought to be a knife—was found on his person. On June 7, 1988, defendant was charged with assault for striking another inmate in the eye. Defendant pled guilty to the charge.

Defendant frequently harassed a female correctional officer in the Cook County correctional system. Kelly

Byrne testified that she cited defendant for fighting and sexual misconduct on "several" occasions. Once, when Byrne was working a midnight shift, Byrne ordered defendant to return to his bunk. Defendant went to his bunk and, as he lay down, he took his penis from his underwear and began to masturbate while looking directly at Byrne. As a result of the incident, defendant was removed to segregation for three or four days. When he returned, he began exposing himself to Byrne almost daily. In April or May of 1986, defendant, in an apparently menacing manner, asked Byrne how her little girl was doing. Sometime around June of 1986, defendant told Byrne, "I'll find you and I'll get you." Obviously, defendant's institutional record consisted of more than a few isolated violations of the rules.

At this juncture, we note in passing the testimony of Gigga Bibbs, the victim of defendant's 1980 robbery, and that of Officer Lawrence Beyer, who investigated the robbery and apprehended defendant. Bibbs testified in aggravation that defendant struck her in the face during the course of the robbery. Officer Beyer testified that he apprehended defendant and, as Beyer was placing defendant in a police vehicle, defendant told Beyer, "I'm going to kill you and everyone as soon as I get out of here." We note, too, the testimony of Officer Joseph Pedersen, who, responding to a report of shots fired, observed defendant drop a 410-gauge shotgun over a fence, into some bushes. Officer Francis Higgins testified that defendant had been implicated in a burglary; however, charges were dropped when the victim chose not to proceed.

We now turn, briefly, to defendant's educational aspirations and work history. Defendant apparently never expressed an interest in improving his mind. His mother testified he dropped out of high school after one year because, she supposed, "he just didn't like going." Nothing of record indicates defendant took classes while in prison,

other than, perhaps, defendant's verbal abuse of Brian Tessor. There was, however, no affirmative testimony indicating that defendant took classes. According to his sister, defendant never held a real job. We find no refutation of that statement in this record.

Despite some evidence that he had killed someone earlier in his life—a factor not to be lightly regarded—Driskel's background is not so dominated by violence and threats of violence as is the case with defendant. Defendant demonstrated a readiness to engage in acts of violence, involving both other inmates and correctional officers. His prior offenses also involved acts of violence. A rational distinction can thus be drawn between Driskel's situation and defendant's. Defendant was, is, and probably would continue to be a danger to other inmates and correctional officers in the prison setting.

Apart from that, an equally important factor in this case is the relative culpability of the codefendants. Defendant claims Driskel was at least as culpable as he and seeks to portray Driskel as the moving force in the commission of the offense. There was significant evidence to the contrary, indicating defendant may have been the instigator. Considering only defendant's statements, it is clear defendant was in possession of the knives used in the offense, and gave Driskel a knife outside Brown's apartment door. According to defendant's oral statement, as Driskel stood near Brown and defendant stood nearby, defendant asked Driskel, "What are you going to do?" This statement could be interpreted either as a genuine question, or as prompting Driskel to proceed. Driskel immediately thereafter stabbed Brown, as did defendant. Moreover, it was defendant who forced open the bedroom door to get to the women and children. When one of the women ran out of the bedroom, it was defendant who ordered Driskel to "kill her too."

These facts seem consistent with evidence presented in support of Driskel's defense of compulsion which, while not a proper defense to the murders, was nonetheless submitted to the jury for consideration on the other charges. Although the jury apparently rejected the defense as to *most* of the charges—it acquitted Driskel of home invasion—it would have been proper for the jury to have considered evidence of compulsion as mitigating evidence sufficient to preclude execution. (See *Gleckler*, 82 Ill. 2d at 165.) Driskel testified that he had been stabbed by defendant approximately one month prior to the murders. Defendant was by far the larger man of the two. Driskel testified that his intention had been to burgle Brown's residence if no one were home. Defendant prompted him to proceed even though people were present and, to that end, defendant handed him the knife and urged him to commit various acts once inside the apartment. For instance, defendant directed him to stab Urica Winder, and Driskel did so, but only after defendant threatened him with a knife. Driskel's sister testified that Driskel was indeed a follower who would do what defendant told him to do. Evidence that a defendant is a follower, rather than a leader, has been held to be a significant mitigating factor in disparate sentencing analysis. (*Gleckler*, 82 Ill. 2d at 171.) We note, too, that Driskel had told the jury he moved the baby, Shanita, to a bedroom to keep her from being harmed.

We find evidence in the record which could account for the disparate treatment of defendant and Driskel. Therefore, defendant's death sentence was not unreasonably disparate from his codefendant's natural life sentence.

## 7. Constitutional Issues

Defendant raises several constitutional issues which this court has previously addressed and rejected. He claims that the provision of our death penalty statute,

"which makes one eligible for the death penalty if the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty is so vague that it results in arbitrary imposition of the death penalty." We held otherwise in *People v. Kidd* (1989), 129 Ill. 2d 432, 454-56, and *People v. Odle* (1988), 128 Ill. 2d 111, 138-41. We see no reason to reexamine the question here. We take the same position with respect to defendant's arguments that the death penalty statute (1) places the burden on defendant to prove death should not be imposed; (2) grants unguided prosecutorial discretion to select candidates for the death penalty; and (3) does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. This court rejected these contentions in *People v. Brownell* (1980), 79 Ill. 2d 508, 531-34, *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 533-43, and *People v. Kubat* (1983), 94 Ill. 2d 437, 503-04. See also *People v. Caballero* (1984), 102 Ill. 2d 23, 49.

For the reasons stated above, we affirm the judgment of the circuit court of Cook County. The clerk of this court is directed to enter an order setting Tuesday, January 14, 1992, as the date on which the sentence of death entered by the circuit court shall be executed. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the correctional institution wherein defendant is confined.

*Affirmed.*

JUSTICES BILANDIC and FREEMAN took no part in the consideration or decision of this case.